UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
BARBARA ANN PERPALL and PAUL U.
PERPALL

                    Plaintiffs,

- against -

PAVETEK CORP., RICHARD A. WHEELER,
and WILLIAM STILPHEN,

                    Defendants.
--------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**
12-CV-0336 (PKC)

PAMELA K. CHEN, United States District Judge:

This diversity action arose out of a motor vehicle accident that occurred on December 9, 2010 (the "2010 accident") in Brooklyn, New York.  Plaintiffs Barbara Perpall ("Perpall" or "Plaintiff") and Paul Perpall commenced this against Defendants Pavetek Corp. ("Pavetek"), Richard Wheeler ("Wheeler"), and William Stilphen ("Stilphen") in connection with the accident.  Plaintiffs allege that Wheeler was driving a car, to which a trailer was attached, and that the trailer hit the car that Perpall was driving.  (Dkt. 15 ("Am. Compl.") ¶ 17, 24.)  Plaintiffs allege that the car driven by Wheeler and the trailer were owned by Pavetek and Stilphen.  (Am. Compl. ¶ 17–19, 27.)  Perpall alleges that Defendants' negligence caused severe and serious emotional harm and physical injuries to her head, neck, back, and both shoulders.  (Dkt. 15, Am. Compl. ¶¶ 27, 29–30.)  Paul Perpall claims loss of consortium.  (Am. Compl. ¶ 34.)

Before the Court is Defendants' motion for summary judgment on the grounds that (1) the December 9, 2010 accident did not proximately cause Perpall's injuries, and (2) Perpall cannot show that she sustained "serious injury" as defined by New York Insurance Law § 5102(d). Plaintiffs oppose this motion.  For reasons explained below, the Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

# BACKGROUND

## I. LOCAL CIVIL RULE 56.1

Neither party has fully complied with Local Rule 56.1. Under the Local Rule, a party moving for summary judgment must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, *must be followed by citation to evidence which would be admissible*, set forth as required by Fed. R. Civ. P. 56(c)." Local Civ. R. 56.1(d) (emphasis added). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Contrary to Local Rule 56.1 (d), Defendants failed to cite to the record in support of Paragraphs 29, 31, 32, 33, and 35 in their Rule 56.1 Statement. (*See* Dkt. 73-1.)

In addition, Local Rule 56.1 requires Plaintiffs to either admit or deny Defendants' 56.1 statements with citations to admissible evidence. Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."). In Plaintiffs' Rule 56.1 Counter-Statement, they do not admit or deny Paragraphs 7, 29, 30, 31 of Defendants' Rule 56.1 Statement. (*See* Dkt. 75-1.) The Court therefore deems the facts in Paragraphs 7 and 30 as undisputed. *See* Local Civ. R. 56.1 (c).[1] In

---

[1] Paragraphs 29 and 31 of Defendants' 56.1 Statement are not deemed admitted because Defendants failed to cite to the record.

their 56.1 Counter-Statement, Plaintiffs also improperly make legal arguments, refer the Court to discussions in their Memorandum of Law, and even resort to exclamatory rants. (*See* Dkt. 75-1 ("Pl. 56.1") at ¶¶ 18,[2] 20, 23,[3] 34[4].)

Other submissions by the parties are similarly deficient. For example, both parties' memoranda often fail to cite to the record, even when making fact-based arguments. (*See e.g.*, Dkt. 73-10, ("Def. Mem") at ECF[5] 18–19[6]; Dkt. 75-2, ("Pl. Opp.") at ECF 14[7].) It is completely unhelpful to the Court and the party's argument to cite to an entire exhibit when that exhibit consists of fifty pages of medical office visit notes and billing documentation. Defendants, at times, discuss material that is not even in the record,[8] and both parties have submitted documents

---

[2] "18. *See* discussion regarding the proper characterization of the alleged *prior* <u>right</u> shoulder injury . . . ; in Plaintiffs' Memo of Law (pp. 13 – 15). In short, there is a serious question as to whether or not there <u>was</u> a right shoulder injury at all; or, whether the *single* fleeting reference to the right shoulder was simply a mistake . . . ." (Emphases in original)

[3] "23. Defendants seek to impugn Ms. Perpall for not disclosing this information before her deposition. However, defendants do not set forth *when* and *why* this information should have been disclosed; [sic] in the course of regular and routine methods and procedures of the litigation process."

[4] "34. . . . He states *<u>explicitly</u>* (on p.2) that the **"… left shoulder appears to be normal"**. This is a <u>glaring contradiction</u>! The left shoulder injury – as described and allegedly treated by Dr. Schweitzer for a prolonged period of time – is not likely to have simply *disappeared* within a span of 11 days!" (Emphases in original.)

[5] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

[6] Defendants discuss the treatment records by Dr. Jack Schweitzer and Dr. Appasaheb Naik with *no* citations to specific pages.

[7] "To reiterate, Dr. [Alan] Dayan said that had he been made aware of the prior accident and its aftermath, same would have been noted in the chart. However, based on his testimony and the actual medical documentation relating to the 2005 accident, his opinions as to causation would have remained the same; [sic] as follows."

[8] For example, Defendants discuss Dr. Jeffrey Passick's August 21, 2013 report and state that it is annexed as Exhibit G. (*See* Dkt. 73-10, Def. Mem at ECF 20.) However, a review of

with inconsistent dates—where the date on the first page of a doctor's notes is followed by pages with different dates.[9]

The Court is under no obligation to sift through the parties' voluminous materials to find support for their arguments that they have failed to point out. *See Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out." (citation and quotations omitted)); *see also* 24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 429 F.3d 39, 46 (2d Cir. 2005). As it is, the parties' woefully haphazard and sloppy work has imposed an undue burden on the Court in its effort to ensure that both parties ultimately receive fair consideration of their arguments.

## II.   PLAINTIFF'S MEDICAL HISTORY AND PRIOR ACCIDENT

### A.   Plaintiff's Pre-2010 Lower Back Surgeries

Prior to the 2010 accident, Perpall had two lower back surgeries: one in 1991 and another in 1992. (Dkt. 73-4, Def. Ex. F, ("Perpall Dep. I") at 28:13-18; Dkt. 73-9, Def. Ex. N, ("Back Op. Rec.") at ECF 2, 6.) Both surgeries involved Perpall's L4-L5 lumbar spine region. (Dkt. 73-9, Def. Ex. N, Back Op. Rec. at ECF 4, 6.) In 1991, Perpall received a laminectomy and a diskectomy at L4-L5 right and a foraminotomy in the same area. (*Id.* at ECF 4.) In 1992,

---

Exhibit G reveals that Defendants have submitted only Dr. Passick's reports dated 7/10/2013, 12/16/2014, 3/30/2015, and 7/29/2015.

[9] Plaintiffs submitted as Exhibit N, Dr. Friedman's May 31, 2013 narrative report. (Dkt. 75-16, Ex. N.) While the first page is dated May 31, 2013, the rest of the report is dated May 31, 2012. Defendants submitted as Exhibit P Dr. Schweitzer's notes. The first page of one of Dr. Schweitzer's notes is dated 8/15/2015 but then is followed by a page dated "8/4/05."

Perpall underwent another laminectomy and discectomy at the right side of L4-L5, a bilateral lateral fusion at L4-L5, and a segmental fixation at the same level. (*Id*. at ECF 6.)

## B.      2005 Accident & Resulting Medical Treatment

In 2005, Perpall was in a car accident.[10]   (Perpall Dep. I at 29:22–23; Def. 56.1 ¶ 23.) Perpall was subsequently treated by multiple doctors. (*See* Dkt. 73-9, Def. Ex. O, Dr. Irving Friedman's notes; Dkt. 73-9, Def. Ex. P, Dr. Jack Schweitzer's notes; Dkt. 73-9, Def. Ex. Q, Dr. Appasaheb Naik's notes.)   Perpall testified that, after the accident, she received medical treatment for her "whole back" and her left shoulder, that she hired the same attorney who is now representing her in the instant suit, and that the case eventually settled. (Dkt. 73-4, Def. Ex. F, ("Perpall Dep. I") at 20:4–21, 30:8–10.)   She testified that she underwent two years of physical therapy for her pain following the 2005 accident. (*Id.* at 20:1–3.)

### 1.      Dr. Irving Friedman

On July 13, 2005, the day after Perpall's 2005 accident, Perpall consulted with her long-time treating physician, Dr. Irving Friedman, a neurologist. (Dkt. 73-9, Def. Ex. O at ECF 15.) Her chief complaints that day were headaches, violent neck pain that radiated into her left shoulder, and persistent low back pain. (*Id.*)   After conducting a physical examination, Dr. Friedman concluded that Plaintiff had sustained acute post-traumatic injuries to her cervical and lumbar spine, and that—even though Perpall had a long history of lumbar spine pain—the accident "dramatically exacerbated" her lower back condition. (*Id.* at ECF 16.)  Dr. Friedman also concluded that Perpall had post-traumatic left shoulder syndrome and noted the need to "rule out rotator [cuff injury]" and "impingement." (*Id.*)  Perpall followed-up with Dr. Friedman throughout 2005 and 2006. (*Id.* at ECF 24.)

---

[10] Plaintiffs state that Perpall was in a car accident on July 12, 2005. (Dkt. 75-2, Pl. Opp. at ECF 13.)

In a January 22, 2007 narrative report, Dr. Friedman summarized the history of Perpall's consultation with him up to that point regarding cervical spine and left shoulder pain.[11] While Perpall's right shoulder was near full range of motion, her left shoulder had a markedly diminished range of motion. (*Id.* at ECF 27.) He noted under the heading "CAUSALITY" that "[t]he [ ] multiple neuro-spinal-ortho deficits are directly and causally related to the injuries sustained on July 12, 2005 . . . ." (*Id.*) He further stated, "The patient's prognosis for any further functional improvement is extremely poor in view of the chronicity of her symptoms and her multiple [ ] clinical, radiographic, and electrophysiologic abnormalities . . . The above [ ] deficits are to be considered permanent in nature and causally related. The patient's prognosis remains guarded." (*Id.* at ECF 28.)

Perpall has not pointed to any evidence that she was seen by Dr. Friedman between January 2007 and December 20, 2010.[12]

---

[11] Dr. Friedman noted that Perpall was experiencing the following conditions: chronic post-traumatic cervical myofascitis/spasm, multiple post-traumatic disc bulges in her cervical spine, chronic bilateral C4-C5-C6 polyradiculopathy, post-traumatic left shoulder syndrome with impingement, post-traumatic myofascitis/spasm, exacerbation of prior quiescent chronic lumbar arthritic condition, and post-traumatic occipital cephalgia. (*Id.* at ECF 27.) He also stated that "[t]he patient remained with marked spasm and multiple myofascial trigger points in the paracervical regions. She [had] daily occipital headaches. Cervical rotation was guarded to 30 degrees out of 90 right and left. Grip remained diminished in the left hand compared to the right. DTR's were diminished in the left upper extremity compared to the right." (*Id.* at ECF 26–27.)

[12] However, Plaintiff testified that after two years of physical therapy in her left shoulder following the 2005 accident, she started "feeling better" and that she was no longer feeling any pain or discomfort in her left shoulder. (Dkt. 73-4, Ex. F, Perpall Dep. I at 30:25–31:6.)

2.    Dr. Jack Schweitzer[13]

Perpall also saw Dr. Jack Schweitzer, a neurologist, on August 4, 2005, soon after her 2005 accident.  (Dkt. 73-9, Def. Ex. P at ECF 30.)  She saw Dr. Schweitzer throughout 2005 and 2006 mainly for her neck pain, headaches, and left shoulder pain.   (*See id.* at ECF 54.)  Dr. Schweitzer's notes dated September 22, 2005, state that Perpall's "MRI of the left shoulder was not consistent with any rotator cuff tear" and that there was evidence of "acromioclavicular productive changes without impingement noted."  (Dkt. 75-12, Pl. Ex. J, Dr. Schweitzer's notes at ECF 4.)  Dr. Schweitzer's February 9, 2006 notes state that Perpall had undergone, in January 2006, a manipulation of the left shoulder under an intraarticular block.  (Dkt. 73-9, Def. Ex. P at ECF 45.)  Dr. Schweitzer also noted "[s]uspicion of impingement syndrome left shoulder with internal derangement left shoulder."  (*Id.*)  By April 3, 2006, Dr. Schweitzer had diagnosed Perpall with, among other things, impingement syndrome and internal derangement in her left shoulder.  (*Id.* at ECF 46.)  According to Dr. Schweitzer's July 7, 2006 notes, Perpall reported that, while the pain in her left shoulder persisted, the level of pain had improved; she also reported that the left shoulder ranges of motion had improved subsequent to the manipulation. (*Id.* at ECF 52.)

3.    Dr. Appasaheb Naik

On May 14, 2007, Perpall consulted with Dr. Appasaheb Naik.  (Dkt. 73-9, Def. Ex. Q at ECF 83.)  Dr. Naik's notes indicate that Perpall had been experiencing severe pain in the right elbow in spite of treatment with medication and therapy.  (*Id.*)  Dr. Naik's examination of

---

[13] Some of Dr. Schweitzer's visit notes (Dkt. 73-9, Def. Ex. P), which Defendants submitted, have the date of service redacted, making it unclear as to the relevance of the document.  (*E.g. Id.* at ECF 36, 38, 62.)  It is also unclear whether the record for Perpall's visit on August 15, 2005, is complete.  (*See id.* at ECF 31–33) (first page dated August 15, 2005, is followed by pages dated August 4, 2005).  Any documents for which the Court cannot readily determine the date of service or documents that appear incomplete have been disregarded.

Perpall's right shoulder revealed a "moderate degree of discomfort" and a "moderate degree of rotational difficulties[.]" (*Id.* at ECF 84.) At the same time, however, Dr. Naik noted that the "left shoulder appears to be normal." (*Id.* at ECF 84.) About a week later, on May 23, 2007, according to Dr. Naik's notes, Perpall reported "significant degree of pain in the entire right shoulder" and difficulty moving it. (*Id.* at ECF 86.) Dr. Naik diagnosed Perpall with impingement and bursitis of the right shoulder. (*Id.* at ECF 88.) While he also noted that Perpall was experiencing increasing motor weakness and was dropping things, he did not indicate which upper limb was having such symptoms. (*Id.* at ECF 85.)

## III.   DECEMBER 9, 2010 ACCIDENT

The alleged accident at issue in this case occurred on December 9, 2010, in Brooklyn, New York. (Am. Compl. ¶¶ 25–26.) Plaintiffs allege that, at the time of the accident, Wheeler was driving a 1998 Chevrolet to which a trailer was attached and that Wheeler's vehicle hit the front passenger side of the car Perpall was driving. (*Id.* ¶¶ 17, 24.) Plaintiffs also allege that, at the time of the accident, (i) Wheeler was an employee of Pavetek (*id.* ¶ 8), (ii) Pavetek and Stilphen owned the 1998 Chevrolet (*id* ¶¶ 12, 14), and (iii) Pavetek and Stilphen owned the trailer attached to the 1998 Chevrolet (*id* ¶¶ 13, 15). An ambulance took Perpall from the accident scene to the emergency room at Brookdale Hospital Medical Center. (Def. 56.1 ¶ 3; Dkt. 73-4, Def. Ex. F, Perpall Dep. I 84:11–12.) The hospital diagnosed Perpall with backpain and post-traumatic headache, prescribed her medication for pain relief, and discharged her. (Dkt. 73-8, Def. Ex. J; Dkt. 73-4, Def. Ex. F, Perpall Dep. 92:4–11.)

## IV.   DECEMBER 9, 2010 ACCIDENT AND SUBSEQUENT MEDICAL TREATMENT

### A.   Application for no-fault benefits

On December 28, 2010, nineteen days after the accident, Perpall signed a no-fault application in order to receive benefits from State Farm Insurance Company. In a section that

asked her to describe her injury, she listed the following: "Head, Neck, Back, Hip, Right side, Left side of Left Knee." (Dkt. 73-8, Def. Ex. L at ECF 39.) She stated that she was treated by Dr. Byung C. Kang, Dr. Irving Friedman, Dr. Gus Katsigiorgis, and Brookdale University Medical Center. (*Id.*)

### 1.    <u>Dr. Gus Katsigiorgis (December 15, 2010, to November 26, 2012)</u>

On December 15, 2010, Plaintiff sought medical care with Dr. Gus Katsigiorgis. (Dkt. 73-8, Ex. K, Dr. Katsigiorgis' notes at ECF 14.) According to the medical records, Plaintiff complained of experiencing discomfort in her neck and in her thoracic and lumbar spine since the 2010 accident. (*Id.*) In addition, an examination showed muscle tenderness in her cervical, thoracic, and lumbar spine, along with restricted range of motion in her cervical spine. (*Id.*) She was diagnosed with sprains in her cervical, thoracic, and lumbar spine. (*Id.*) Dr. Katsigiorgis' April 18, 2011 notes indicate that Perpall was having neck pain radiating down the right upper extremity to her hand and was also experiencing tingling along with radiating low back pain. (*Id.* at ECF 21.) At an August 24, 2011 visit, approximately eight months after the 2010 accident, Perpall's chief complaint was pain in her left shoulder; Perpall received a cortisone injection for this pain. (*Id.* at ECF 26.) On June 10, 2012, she received another cortisone injection for her shoulder pain, but the medical record does not specify which shoulder received the injection. (*Id.* at ECF 31.) Plaintiff's last documented visit with Dr. Katsigiorgis occurred on November 26, 2012, at which time she was still experiencing neck and shoulder pain. (*Id.* at ECF 37.)

None of Dr. Katsigiorgis' notes mention Perpall's earlier diagnoses of shoulder conditions; *i.e.*, Dr. Schweitzer's April 3, 2006 diagnosis of impingement syndrome of the left shoulder with internal derangement (Dkt. 73-9, Def. Ex. P at ECF 46) and Dr. Friedman's

January 22, 2007 diagnosis of left shoulder syndrome with impingement (Dkt. 73-9, Def. Ex. O at ECF 27).

### 2.    Dr. Alan Dayan

On September 14, 2012, Perpall began consultation with Dr. Alan Dayan, an Orthopedic Surgeon.  (Def. 56.1 ¶ 11; Dkt. 73-8, Def. Ex. M, Dr. Dayan's notes at ECF 50.)  According to Dr. Dayan's notes, Perpall reported experiencing pain in her left shoulder since the 2010 accident.  (Def. 56.1 ¶ 11.)  Based on a review of an MRI of Perpall's left shoulder, Dr. Dayan noted "full thickness rotator cuff tear with severe impingement."  (*Id.*)  Dr. Dayan recommended arthroscopy to treat her left shoulder.  (*Id.*)  Dr. Dayan's notes also indicate that an MRI of Perpall's cervical spine dated April 30, 2012 showed disc herniation at the C5-C6 level.  (Dkt. 73-8, Def. Ex. M at ECF 53.)  Dr. Dayan's September 14, 2012 notes do not reference her 2005 accident.  (Dkt. 73-8, Def. Ex. M at ECF 51.)[14]

On January 3, 2013, Perpall received a left shoulder arthroscopic procedure from Dr. Dayan.  (Dkt. 75-14, Ex. L, Dr. Dayan's notes at ECF 2.)  After this surgery, Perpall had multiple follow-up visits with Dr. Dayan.  (*Id.*)  On June 28, 2013, about six months after the surgery, Dr. Dayan noted that "there will be partial permanency to the left shoulder, but maximum medical improvement will not be reached until approximately 12 to 18 months from the time of the surgery."  (*Id.* at ECF 64.)

Then, according to Dr. Dayan's September 12, 2014 notes, although Perpall was still experiencing stiffness in her left shoulder, her right shoulder pain became her main concern. (Def. 56.1 ¶ 14.)  After some follow-up visits with Dr. Dayan to discuss the pain in her right

---

[14] At his deposition in this case, Dr. Dayan testified that had Plaintiff disclosed her previous left shoulder injury to him, he would have included that information in his initial consultation notes.  (Def. 56.1 ¶ 16.)

shoulder (*see* Dkt. 75-14, Pl. Ex. L at ECF 66–68), on January 30, 2015, Dr. Dayan recommended to Plaintiff that she undergo an arthroscopy to her right shoulder (Def. 56.1 ¶ 15). Dr. Dayan stated in his notes that her "right shoulder . . . is the direct result of overuse and overcompensation, of the use of the right arm from her left shoulder injury, which was injured in a car accident in 2010." (Dkt. 75-14, Pl. Ex. L at ECF 68.) At no point did Perpall tell Dr. Dayan that, prior to the 2010 car accident, she had been diagnosed with right shoulder tendinopathy and impingement syndrome. (Def. 56.1 ¶ 18.)

### 3. Dr. Friedman[15]

Dr. Friedman, along with Drs. Katsigiorgis and Dayan, regularly treated Perpall after her 2010 accident. (Dkt. 75-7, Pl. Ex. E, Dr. Friedman's notes; Dkt. 75-15, Pl. Ex. M, Dr. Friedman's notes ("Pl. Ex. M"); Dkt. 75-16, Pl. Ex. N, Dr. Friedman's notes.)

On December 20, 2010, Perpall was examined by Dr. Friedman. (Dkt. 75-15, Ex. M at ECF 10.) In his report, under "Impression," Dr. Friedman stated, "As a result of injuries sustained during an MVA on December 9, 2010, Ms. Barbara Ann Perpall had sustained the following deficits: (1) Acute post-traumatic cervical myofascitis/spasm with radiculopathy. (2) Acute post-traumatic lumbar myofascitis/spasm with radiculopathy. (3) Bilateral shoulder syndrome. Rule out impingement. Rule out rotator. (4) Acute post-traumatic cephalgia with tinnitus and vertigo. (5) Marked aggravation and exacerbation of prior cervical and lumbar syndrome. (6) Status post prior lumbar surgery in 1991." (*Id.*) Dr. Friedman found that there had been a "dramatic aggravation and exacerbation of her prior spinal syndrome" and that the "deficits [were] directly and causally related to the injuries sustained on December 9, 2010. Mr. [sic] Perpall had been working regularly for years prior to that." (*Id.* at ECF 11–12.) Dr.

---

[15] As noted, Dr. Friedman was the neurologist who treated Perpall after her 2005 accident, until January 2007.

Friedman did not reference Perpall's 2005 accident, the resulting injuries to Perpall's left shoulder, Dr. Friedman's treatment of Perpall, or his prior prognosis with regard to her pre-2010 injuries.

On June 1, 2012, Dr. Friedman summarized Perpall's course of treatment since her December 20, 2010 visit. (75-15, Pl. Ex. M.) For about a month after Perpall saw Dr. Friedman, she had experienced severe daily neck and low back pain. (*Id.* at ECF 2.) When Perpall saw Dr. Friedman on February 28, 2011, he noted that Perpall's grip was decidedly diminished in both hands. (*Id.*) By June 23, 2011, Perpall complained of bilateral shoulder pain and of daily spasm in the paracervical and paralumbar regions. (*Id.* at ECF 3.) While Dr. Friedman acknowledged that Perpall had received back surgery in 1992, he noted that she had been doing remarkably well and had been working regularly since that time. Again, he opined that her cervical and lumbar syndrome were dramatically aggravated and exacerbated by the injuries caused by the 2010 accident. (*Id.* at ECF 8.)

Dr. Friedman's May 31, 2013 narrative report[16] also summarized Perpall's ongoing care and commented on the independent medical examination reports by Defendants' experts, Drs. Jeffrey Passick and Ashok Anant. (Dkt. 75-16, Pl. Ex. N.) In 2007, Dr. Friedman stated that Perpall's neck and lower back injuries and left shoulder impingement were "permanent in nature" and that the prognosis of any further functional improvement was "extremely poor." On May 31, 2013, he provided a very different opinion. (*Compare* Dkt. 73-9 at ECF 27–28 *with*

---

[16] Although Plaintiffs cite to Dr. Friedman's May 31, 2013 narrative report, it is unclear if the document in the record is an accurate and complete copy of the report. (*See* Dkt. 75-16, Ex. N.) While the first page is dated May 31, 2013, the rest of the report is dated May 31, *2012*. However, because the text of the report discusses Perpall's visits in 2013, the Court will infer that the dates noted in ECF 3–7 are typographical errors.

Dkt. 75-16, Pl. Ex. N.)  Dr. Friedman "vigorously disagree[d]" with the reports by Defendants' experts, stating  that Perpall had "basically recovered" from her injuries caused by the 2005 car accident, "had returned to full time work with minimal residua," but was now experiencing "gross deficits at the cervical and lumbar spine."  (Dkt. 75-16, Pl. Ex. N at ECF 5–6.)  He concluded that "with a reasonable degree of neurological certainty, had Ms. Perpall had [sic] not been reinjured on December 9, 2010, she would not have had as rapidly progressive cervical and lumbar deficits.  She would not be a candidate for lumbar surgery at this time.  She certainly would not have had left shoulder arthroscopic repair."  (*Id.*)

In a February 6, 2015 report, Dr. Friedman summarized Perpall's history of treatment and noted that Perpall had developed increasing pain in her right shoulder.  (Dkt. 75-7, Pl. Ex. E.) He again concluded that Perpall's injuries were "directly and causally related" to the 2010 accident, and that, in spite of a history of prior lumbar surgery in 1991 and 1992 and a 2005 car accident, Perpall had "fully" and "completely" recovered.  (*Id.* at ECF 6.)

## B.    Plaintiff's Examination by Defendants' Doctors

Perpall was examined by Dr. Jeffrey Passick (Def. 56.1 ¶ 10) and Dr. Ashok Anant (Pl. 56.1 ¶ 10) on behalf of the Defendants.[17]

### 1.    Dr. Jeffrey Passick[18]

On April 10, 2013, July 10, 2013, and July 29, 2015,[19] Dr. Jeffrey Passick performed an independent orthopedic examination of Perpall and concluded that the injuries to her neck, back,

---

[17] In discovery, Plaintiffs were provided with Drs. Passick's and Anant's reports, and had the opportunity to depose both experts.

[18] As previously noted, Defendants have submitted in their Exhibit G, Dr. Passick's reports dated 7/10/2013, 12/16/2014, 3/30/2015, 7/29/2015.

[19] (Dkt. 73-6, Def. Ex. G, Dr. Passick's reports ("Def. Ex. G") at ECF 6.)

and left shoulder were not causally related to the December 9, 2010 accident. (Def. 56.1 ¶ 10.) In forming his opinion, Dr. Passick examined, among other things, his past orthopedic examination reports of Perpall, notes by other doctors who treated Perpall (Dr. Friedman, Dr. Naik, Dr. Schweitzer, Dr. Katsigiorgis, and Dr. Dayan), Perpall's operative records, and various MRI reports. (Dkt. 73-6, Def. Ex. G, Dr. Passick's reports.) Dr. Passick opined that, given Perpall's prior history of significant left shoulder pathology, the surgery to her left shoulder was performed for non-traumatic shoulder derangement unrelated to the 2010 accident. (Dkt. 73-6, Def. Ex. G at ECF 4–5.) He also noted that the MRI shows a pre-existing disease in Perpall's right shoulder. (*Id.* at ECF 12.) He opined that "[o]veruse, if present, might cause inflammation, but no anatomic findings demonstrable on MRI." (*Id.* at ECF 12–13.) Dr. Passick attributed Perpall's current lower back condition to her previous spinal fusion surgery. (*Id.* at ECF 20.) As for Perpall's cervical spine, Dr. Passick stated that "there [was] no objective evidence of orthopedic residuals to the cervical spine related to the accident of 12/9/10." (*Id.*) He also noted, after examining Perpall's MRI report dated July 14, 2005, that Perpall had pre-existing disc bulges at C5-6 and at other segments of her cervical spine. (*Id.* at ECF 15.)

### 2. Dr. Ashok Anant

On April 5, 2013, Dr. Ashok Anant performed an independent neurosurgical evaluation of Perpall. (Dkt. 73-6, Def. Ex. H, Dr. Anant's reports at ECF 22.) Dr. Anant stated that "[Perpall] had voluntary exaggeration of left sided weakness and there is no objective finding of true neurological weakness." (*Id.* at 24.) Dr. Anant concluded, based on his review of Perpall's cervical spine MRI, that the 2010 accident did not produce any cervical spine injury and that there was no objective evidence of cervical myelopathy or cervical radiculopathy. (*Id.* at 26.)

As for Perpall's lower back, Dr. Anant opined that the condition was caused by the spinal fusions she had previously received. (*Id.*) Dr. Anant also commented that the lumbar EMG,

which was read as showing S1 radiculopathy, did not correlate with Perpall's L3-4 stenosis found on MRI studies and CT studies. (*Id.*)

## V.        PROCEDURAL HISTORY

Plaintiffs filed the instant lawsuit against Wheeler and Stilphen on January 24, 2012. (Dkt. 1.)  Defendants served their answer on March 16, 2012.  (Dkt. 2.)  Plaintiffs then filed an amended complaint on December 26, 2012, adding Pavetek as a Defendant. (Dkt. 15.) Defendants served their answer to the amended complaint on January 17, 2013.  (Dkt. 17.) Although expert discovery regarding Perpall's injuries closed in August 2013 and the parties filed their joint pre-trial order in September 2013, the Court extended the discovery cut-off to February 26, 2015, based on multiple requests by Plaintiff and over Defendants' objection. (*See* February 23, 2015 Order.)  On April 1, 2015, the Court granted Plaintiffs' motion to expand their damages claim to include injury to her right shoulder (April 1, 2015 Order) and also granted Defendants' motion to take a deposition from Dr. Dayan (August 11, 2015 Order).   After Defendants deposed Dr. Dayan, Plaintiffs sought to strike Dr. Dayan's deposition testimony in its entirety. (*See* October 8, 2015 Minute Entry.)  While denying Plaintiffs' motion to strike, the Court directed Plaintiffs to address any inaccuracies in the deposition transcript through a declaration from Dr. Dayan. (*Id.*)   However, Plaintiffs never did so.  On January 27, 2016, Defendants moved for summary judgment  (Dkt. 73.)

### DISCUSSION

Before discussing Defendants' arguments presented in their motion for summary judgment, the Court addresses two preliminary issues raised by Plaintiffs: (1) the admissibility of Defendants' medical records evidence and (2) whether Plaintiffs must prove that Perpall's injuries qualify as "serious injury" under New York Insurance Law § 5104(a).

## I.    ADMISSIBILITY OF EVIDENCE

In moving for summary judgment, Defendants rely, in part, on Perpall's medical records relating to the 2010 accident and also her pre-2010 medical conditions and treatment. Plaintiffs assert that these medical records are inadmissible evidence that the Court should not consider because (1) they are unsworn and uncertified, and (2) some of them state "dictated but not read." (Dkt. 75-2 at ECF 8.) As discussed below, even though Defendants have failed to comply with the *federal* certification requirements for the medical records, the Court denies Plaintiffs' request to exclude them from consideration with respect to Defendants' summary judgment motion.

As an initial matter, both parties incorrectly cite to New York law on the issue of whether a defendant may satisfy his burden as the movant at the summary judgment stage with unsworn reports by the plaintiff's physicians. (*See* Dkt. 75-2 at ECF 8–9; Dkt. 74 at ECF 6–7.)[20] This action is in federal court, and thus federal procedural and evidentiary rules apply. *See Rand v. Volvo Finance N. Amer., Inc.*, No. 04–CV–0349, 2007 WL 1351751, at *13 (E.D.N.Y. May 8, 2007) (collecting cases); *Nasrallah v. Helio De,* No. 96–CV–8727, 1998 WL 152568, at *3, 7 n.4 (S.D.N.Y. Apr. 2, 1998) (Sotomayor, J.) (rejecting defendants' reliance on New York case

---

[20] Even if the Court were to consider New York evidentiary law, the cases Plaintiffs cite are inapplicable at best. *Ayotte v. Gervasio*, 81 N.Y.2d 1062 (App. Div. 1993) does not discuss in any way admissibility of documents for the purpose of summary judgment motions. In *Dowling v. Mosey*, 821 N.Y.S.2d 326 (App. Div. 2006), the court found inadmissible a doctor's report, which contained a stamped facsimile signature and the notation that it had been "dictated but not read," although affirmed under the penalty of perjury, because it was the *plaintiff* who submitted the report. Under New York case law, a *plaintiff* must submit admissible evidence in the form of sworn affidavits or affirmations by physicians in opposition to a motion for summary judgment based on the plaintiff's failure to establish "serious injury" within the meaning of New York Insurance Law § 5102(d). *Bonsu v. Metropolitan Suburban Bus Auth.*, 610 N.Y.S.2d 813, 813 (App. Div. 1994). By contrast, defendants are generally allowed to rely on unsworn reports by the plaintiff's physicians, but the defendants must provide evidence from their own physicians in the form of sworn affidavits. *See Barth v. Harris*, No. 00–CV–1658, 2001 WL 736802 (S.D.N.Y. Jun. 25, 2001) (citing *McGovern v. Walls*, 607 N.Y.S.2d 964 (App. Div. 1994) and *Looney v. Epervary*, 599 N.Y.S.2d 989, 989–90 (App. Div. 1993).

law and instead applying the Federal Rules of Evidence ("FRE") and the Federal Rules of Civil Procedure ("FRCP")); *Williams v. Elzy*, No. 00–CV–5382, 2003 WL 22208349, at *5–6 (S.D.N.Y. Sept. 23, 2003) (rejecting New York's rule that a medical provider may not rely on unsworn medical reports of others because New York evidentiary rules are inapplicable in federal court and noting FRE 703 allows a medical provider to rely on unsworn reports in forming an opinion); *Maxwell v. Becker*, No. 12–CV–864S, 2015 WL 4872137, at *7–8 (W.D.N.Y. Aug. 13, 2015) ("Plaintiff's argument that the medical records and reports on which Defendant relies in support of summary judgment must be sworn is premised on the civil procedure law of New York, which is inapplicable in this court.").

Here, Defendants have submitted in support of their motion, *inter alia*, uncertified records from Brookdale University Hospital Medical Center, Dr. Dayan, Dr. Katsigiorgis, Dr. Friedman, Dr. Schweitzer, and Dr. Naik that detail Plaintiff's treatment and care following Perpall's 2005 accident and the 2010 accident. Because these records are relevant to the issue of whether Perpall's claimed injuries were caused or exacerbated by the 2010 accident or whether they were the result of pre-existing medical issues, there is preference for their admission. *See Cargill, Inc. v. Sears Petroleum & Transport Corp.*, 334 F. Supp. 2d 197, 247 (N.D.N.Y. 2004) ("Because of the preference to have issues and claims decided on their merits, rather than on the basis of a procedural shortcoming, the exclusion of otherwise relevant evidence on technical grounds is generally not favored, absent compelling circumstances."); *see also Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31, 47 (2d Cir. 2015) (citing *Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320 (2d Cir. 1986)) (describing the Second Circuit's "strong preference for resolution of disputes on their merits" and "preference for resolving doubts in favor of a trial on the merits").

Plaintiffs object to the admission of some of the medical records on the basis that they are unsworn or uncertified. However, the records being unsworn or uncertified, in itself, does not bar their consideration for purposes of a summary judgment motion in federal court. FRCP 56(c)(4) no longer requires that a document referred to in an affidavit or declaration submitted in support of the motion be sworn or certified. *See* Fed. R. Civ. P. 56(c)(4) advisory committee's note to 2010 amendment ("The requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record."). A review of the medical records submitted by Defendants in this case reveals nothing that would indicate a lack of trustworthiness. "Their appearance, contents, and substance are what one would expect of such records and support [Defendants'] claim that they are what they appear to be." *See Rodriguez*, 788 F.3d at 46 (citing, *inter alia*, FRE 901(b)(4)). As Defendants point out in their reply, Plaintiffs do not contest that Perpall consulted with the doctors listed in those records. (*See* Dkt. 74, Defendants' Reply at ECF 8; *see also* Dkt. 75-2, Pl. Opp.) Indeed, Plaintiffs themselves submitted to the Court sworn copies of notes and reports by Dr. Friedman, Dr. Schweitzer, and Dr. Dayan. (Dkt. 75 at ECF 2.) Comparison of the sworn and unsworn visit notes of these doctors further confirms that there is no reason to be concerned about the trustworthiness of the medical records provided by Defendants. (*Compare* Dkt. 73-9, Def. Ex. O *with* Dkt. 75-15, Pl. Ex. M; *compare* Dkt. 73-9, Def. Ex. P *with* Dkt. 75-12, Pl. Ex. J; *compare* Dkt. 73-8, Def. Ex. M *with* Dkt. 75-6, Def. Ex. D.)

However, the more fundamental admissibility question that Plaintiffs' certification argument implicates, yet fails to address, is whether the lack of certification for the medical records makes them inadmissible as hearsay under the Federal Rules of Evidence. Courts in this

Circuit have generally held that medical records are admissible under the business record exception to the hearsay rule, provided that they satisfy the requirements of FRE 803(6). *See Parks v. Blanchette*, 144 F. Supp.3d 282, 292 (D. Conn. 2015) (finding medical records submitted by defendants in connection with summary judgment motion would be admissible under business records exception provided they meet the requirements of Fed. R. Evid. 803(6)); *see also Middleton v. Rivera*, No. 05 Civ. 3145, 2010 WL 4242852, at *8 (S.D.N.Y. Mar. 9, 2010) ("Under Rule 803(6) of the Federal Rules of Evidence, medical records are considered business records and as such, are admissible into evidence, and not considered hearsay."). "To be admissible as business records, the documents must have been made near the time of the recorded event by someone with knowledge and must have been kept in the course of regularly conducted business activity." *Parks*, 144 F. Supp. 3d at 292 (citing Fed. R. Evid. 803(6)(A)-(B)); *see also Shea v. Royal Enterprises, Inc.*, No. 09 Civ. 8709, 2011 WL 2436709, at *9 (S.D.N.Y. Jun. 16, 2011) ("[I]t has long been settled law in the federal courts that notations made in hospital records regarding diagnosis and treatment . . . are admissible in evidence." (citation and quotation marks omitted)). These authenticating facts must be attested to by the records custodian or other qualified witness through testimony or "by certifying the records as self-authenticating in compliance Federal Rule of Evidence 902(11)." *Parks*, 144 F. Supp. 3d at 293; *cf. Gissinger v. Yung*, Nos. CV-04-0534, CV-04-5406, 2007 WL 2228153, at *4 (E.D.N.Y. July 31, 2007) (holding that "[i]f properly authenticated and created in the regular course of business contemporaneously with the occurrence by a person with knowledge, medical records can be admissible as business records", and finding submission of affidavit from doctor who created the

medical records was proper authentication) (*citing Hodges v. Keane*, 886 F. Supp. 352, 356 (S.D.N.Y. 1995)).[21]

Here, Defendants appear to rely solely on the affidavit of their counsel to establish the authenticity of the medical records and their admissibility as business records. (*See* Dkt. 73-2.) This affidavit, however, is incompetent for this purpose, since the attorney does not possess the necessary knowledge to authenticate the medical records under Rule 803(6), nor does the affidavit even attempt to attest to any of the Rule 803(6) criteria. *Id.*; *see Hamad v. Cook*, No. 13 Civ. 3222, 2014 WL 3507340, at *7 n.2 (S.D.N.Y. Jun. 30, 2014) ("[The accident report] is proffered by the affirmation of defendants' counsel, who neither attempts to lay the required foundation nor is likely . . . to be competent to do so. This lack of foundation is yet another reason to deem it inadmissible."). Nonetheless, because Plaintiffs rely on reports and notes of the same doctors—most of whom were Perpall's treating physicians—and even some of the same reports and notes that Defendants rely on, the Court will consider the medical records submitted by Defendants for purposes of their summary judgment motion. *See Parks*, 144 S. Supp.3d at 293 (admitting medical records submitted by Defendant, despite lack of authentication required by Rule 803(6), where plaintiff relied on defendants' medical records without objecting to their authenticity (citing cases)); *see also Porter v. Home Depot U.S.A., Inc.*, No. 12–CV–4595, 2015 WL 128017, *4 (E.D.N.Y. Jan. 8, 2015) (denying plaintiff's motion *in*

---

[21] The Court notes that the admission of medical documentation as business records does not necessarily resolve all hearsay objections. For example, the court in *Gissinger* found that the business records exception did not apply to documents created by non-testifying doctors in the absence of an affidavit, stating that the business records exception did not permit the plaintiffs to have the authenticating doctor "serve as a conduit for the unauthenticated records purportedly kept by other, non-testifying doctors." *Id*. Here, because neither side has specifically raised this issue and because the Court is admitting Perpall's medical records largely on the basis of both sides' reliance on them and the absence of doubt as to their authenticity, the Court does not address this issue.

*limine* as to her objection to defendant's use of plaintiff's medical record at trial, noting that "[a]s Plaintiff apparently intends to offer other medical records kept by the same physician, the court assumes that the records will be certified and/or that the parties will stipulate to their proper admission as business records.").  Though, in contrast to *Parks*, Plaintiffs have not relied on all the medical records submitted by Defendants and have objected to their admission, the Court finds that Plaintiffs' reliance on medical records from the *same* doctors[22] negates any objection Plaintiffs might raise to the Court's consideration of Defendants' medical records.  Furthermore, as discussed earlier, Plaintiffs have offered no reason to question the authenticity of the medical records submitted by Defendants, including those of Drs. Katsigiorgis or Naik, whom neither party retained, but who provided treatment to Plaintiff that is relevant to the injuries Plaintiff claims in this action.  *See Evans v. Consumer Info. & Dispute Resolution*, No. 05–CV–8252, 2006 WL 1209904, at *4 n.5 (S.D.N.Y. May 5, 2006) (considering unsworn medical records submitted by Plaintiff because nothing indicated lack of trustworthiness).  Lastly, "it is 'well-established' that 'even inadmissible evidence may properly be considered on summary judgment if it may reasonably be reduced to admissible form at trial."  *Parks*, 144 F. Supp.3d at 293 (quoting *Bill Salter Advert., Inc. v. City of Brewton, Ala.*, 07-0071-WS-B, 2008 WL 1823237, at *4 (S.D. Ala. Jan. 18, 2008)); *Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents"), *cert. denied*, 541 U.S. 937 (2004).  Here,

---

[22] The only exception is Dr. Katsigiorgis, whose notes Plaintiffs do not rely on. However, Dr. Katsigiorgis's notes are of limited relevance and serve only to provide background information.  Defendants do not rely on Dr. Katsigiorgi's opinions in support of their arguments, nor are they material to the Court's findings.

there is nothing to suggest that Defendants would not be able to obtain for trial the necessary authenticating testimony or FRE 902(11) certification to satisfy FRE 803(6).[23]

Accordingly, the Court will consider all of the medical records submitted by Defendants in support of their motion for summary judgment.

## II.     NEW YORK'S NO-FAULT LAW & APPLICABILITY OF § 5102(d)

Next, the Court addresses Plaintiffs' assertion that Section 5102(d) of the New York Insurance Law is inapplicable to this case.  (*See* Dkt. 75-2 at ECF 2–8.)  Article 51 of the New York State's No-Fault Insurance Law ("N.Y. Ins. Law") provides that in a personal injury or negligence action between "covered persons," "there shall be no right of recovery for non-economic loss, [*e.g.,* pain and suffering,] except in the case of a serious injury, or for basic economic loss."  N.Y. Ins. Law §§ 5104(a), 5102(c).[24]  As relevant to Defendants' argument, a "covered person" includes "any owner, operator or occupant of, a motor vehicle which has in effect the financial security required by article six or eight of the vehicle and traffic law . . . ."  N.Y. Ins. Law § 5102(j).  Plaintiffs contend that N.Y. Ins. Law § 5104(a) does not apply here and that Perpall therefore need not prove that she suffered "serious injury" as a result of the 2010 accident to recover non-economic damages, because: (1) Defendants are not "covered persons"

---

[23] Plaintiffs' argument that Defendants' medical records are inadmissible because some of them contain entries that were "dictated but not read" requires little discussion.  At most, Plaintiffs cite State law authority on this issue, which as previously discussed, *see supra* n. 19, does not stand for the proposition that *Defendants* should be precluded from relying on medical record entries that were dictated but not read.  *See Dowling*, 821 N.Y.S.2d 326 (finding inadmissible doctor's report containing notation, "dictated but not read," because *plaintiff* submitted the report); *Bonsu*, 610 N.Y.S.2d 813 (noting that under New York law, *plaintiff* must submit admissible evidence in the form of sworn affidavits or affirmations by physicians in opposition to a motion for summary judgment based on plaintiff's failure to establish "serious injury" under New York Insurance Law § 5102(d)).

[24] Basic economic loss is statutorily defined as expenses such as medical payments and lost wages totaling $50,000 or less.  N.Y. Ins. Law. § 5102(a).

and (2) Perpall's injury did not arise from the negligent use or operation of a "motor vehicle." As discussed below, these arguments are patently without merit.

### A. Covered Person

N.Y. Ins. Law Section 5104(a) applies only if both parties are so-called "covered persons." *Walsh v. Durkin Bros., Inc.*, 981 F. Supp. 267, 270 (S.D.N.Y. 1997). The parties do not dispute that Perpall is a covered person. Therefore, in order to be insulated from Plaintiffs' recovery of non-economic injuries under Section 5104(a), Defendants must also be "covered persons." *See Cole v. United States*, No. 85–CV–5295, 1986 WL 5805, at *4 (S.D.N.Y. May 16, 1986).

For individuals operating or owning motor vehicles lawfully registered in another state to qualify as "covered persons" (1) their vehicle must maintain liability coverage in excess of the minimum coverage required by Vehicle and Traffic Law § 311(4)(a), and (2) "the [insurance] policy [must have been] issued by an authorized insurer or by an unauthorized insurer which has filed a form consenting to service of process and declaring that its policy shall be deemed to be varied to comply with the requirements of Vehicle and Traffic law article 6." *Marshall v. Nationwide Mut. Ins. Co.*, 562 N.Y.S.2d 832, 853 (App. Div. 1990); *see also Hunter v. OOIDA Risk Retention Group, Inc.*, 909 N.Y.S.2d 88, 95 (App. Div. 2010) (noting that Second Department Appellate Division joins Third and Fourth Departments in finding that drivers of cars registered out-of-state are "covered persons" if they are individuals with liability coverage in excess of the minimum coverage required by Vehicle and Traffic Law § 311(4)(a), and the coverage was issued by an insurer authorized to do business in New York).

Plaintiffs argue, without citing any authority, that Defendants are not "covered persons" because it is unclear that Defendants' insurance policy includes coverage of accidents involving the trailer that was attached to Defendants' vehicle at the time of the accident. (Dkt. 75-2, Pl.

Opp. at ECF 2–3.)  But New York State courts have recognized that N.Y. Ins. Law § 5102(d) applies to cases where the accident involved a trailer.  *See, e.g.*, *Christopher v. Caldarulo*, 608 N.Y.S.2d 998 (Sup. Ct. 1994) (injuries caused by a runaway trailer were considered to have arisen out of the use or operation of a motor vehicle).

Defendants verified that the vehicle involved in the 2010 accident was insured at the time of the accident, with liability insurance coverage limits of $1 million through the Progressive Insurance entity known as United Financial Casualty Company, and that United Financial Casualty Company was an "authorized insurer."  (*See* Dkt. 76, Defendants' Supplemental Affirmation.)  Therefore, Defendants are "covered person[s]" in this case.[25]  *Marshall*, 562 N.Y.S.2d at 853.

## B.    Motor Vehicle

Plaintiffs contend that Section 5102(d) is inapplicable because Perpall's injuries did not arise out of the use or operation of a motor vehicle because she was hit by Defendants' trailer. (Pl. 56.1 at ECF 12 ¶ 3.)  Plaintiffs argue, again without citing any authority, that Defendants' trailer "is certainly *not* a 'motor vehicle.'"  (*See* Dkt. 75-2 at ECF 5) (emphasis in original).

Plaintiff's argument is contradicted by the plain language of Section 311(2) of the New York Vehicle and Traffic Law, which defines motor vehicles for purposes of Section 311(4)(a)

---

[25] To the extent that Plaintiffs make a policy argument that it is against the interest of the New York State to apply New York's No-Fault Insurance Law in this case because it would "benefit out-of-state tortfeasors who may have also committed fraud, perjury and violated New York's laws," Plaintiffs have not substantiated their claims of fraud. Furthermore, New York courts have clearly recognized the applicability of the no-fault law to drivers of cars registered out-of-state.  *See Hunter v. OOIDA Risk Retention Group, Inc.*, 909 N.Y.S.2d 88, 95 (App. Div. 2010).

and, in turn, N.Y. Ins. Law § 5104(a). Section 311(2) explicitly states that the definition of "motor vehicles" "shall also include *trailers,* [and] *semi-trailers.*" (emphasis added).[26]

In sum, because both parties are "covered persons" and the accident involved "motor vehicles" as defined by New York Insurance Law, Plaintiffs must prove "serious injury" in order to recover non-economic damages in this case.

## III.    SUMMARY JUDGMENT STANDARD

A defendant seeking summary judgment must establish that "there is no genuine dispute as to any material fact," and that they are thus "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are facts that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Furthermore, a complete failure to prove an essential element of the nonmoving party's case necessarily renders all other facts immaterial, and entitles the moving party to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010)

---

[26] The cases Plaintiffs cite do not support their argument and are all inapposite. In *Graham v. Gerow*, 6 N.Y.S.3d 859 (App. Div. 2015), the defendants did not oppose the plaintiff's contention that defendants' *farm tractor* and the attached field plow did not qualify as "motor vehicles" under Section 311(2), because they were used exclusively for agricultural purposes. Indeed, Section 311(2) makes it clear that tractors used exclusively for agricultural purposes are not considered motor vehicles. In *Caruana v. Oswego Cnty. Bd. of Co-op. Educ. Servs.*, 809 N.Y.S.2d 750 (App. Div. 2006), the plaintiff was injured when a wheel came off of her car after a student, who was acting under the defendant-school's supervision, had changed the tires on the plaintiff's car. No trailer was involved in that case. In *Mangra v. China Airlines*, 790 N.Y.S.2d 370 (Civil Court of the City of New York, Queens County 2005), the issue was whether a "hi-lo forklift," not a trailer, constituted a motor vehicle for purposes of New York Insurance Law. Despite citing *Mangra*, Plaintiffs did not argue, let alone provide support for the notion, that a forklift is comparable to, or should be treated the same as, a trailer under New York's Insurance Laws.

(citing *Celotex Corp.*, 477 U.S. at 322). Once a defendant has met his initial burden, the plaintiff must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 323–24 (citation and internal quotation marks omitted). In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation and internal quotation marks omitted). However, the party opposing summary judgment must set forth evidence demonstrating a genuine issue for trial, and may not rely only on allegations in its pleadings. *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) ("[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." (citing *Celotex*, 477 U.S. at 324)). "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Achille v. Chestnut Ridge Transp., Inc.*, 584 F. App'x 20, 22 (2d Cir. 2014) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

The Court's inquiry upon summary judgment is "determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250; *see also id.* at 251–52 ("In essence, though, the inquiry . . . [is] whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). In other words, "[s]ummary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist.*

*No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (alterations in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## IV.    PERPALL'S CLAIMS

Perpall alleges that the December 9, 2010 accident caused, *inter alia*, cervical disc herniation at C5-6 spine, disc bulges at L1-2, L2-3, L3-4, and L5-S1 of her lumbar spine, and injury to both of her shoulders.  (Dkt. 73-3, Def. Ex. E ("Pl. Resp. to Interrog.") at ECF 58–60.) She also alleges lumbar radiculopathy and cervical spasm.  (*Id.*)  In addition, she claims that the injury to her left shoulder necessitated surgery and that the surgery caused injury to her right shoulder from overuse, as a result of compensating for her left shoulder impairment.  (*Id.*; Dkt. 75-14, Pl. Ex. L at ECF 68.)

Defendants' motion for summary judgment attacks Plaintiffs' claims on three grounds: (1) Plaintiffs cannot show that the 2010 accident was a proximate cause of Perpall's shoulder injuries, (2) Perpall's injuries to her neck and back are not causally related to the 2010 accident, and (3) Perpall's neck and back injuries do not constitute "serious injuries" under Section 5102(d).

### A.    Causation Standard on Summary Judgment for Recovery of Non-Economic Losses

"In order to recover damages for non-economic loss related to a personal injury allegedly sustained in a motor vehicle accident, a plaintiff is required to present competent, non-conclusory expert evidence sufficient to support a finding, not only that the alleged injury is 'serious' within the meaning of Insurance Law § 5102(d), but also that the injury was proximately caused by the accident at issue." *Carter v. Full Service, Inc.,* 815 N.Y.S.2d 41, 43 (App. Div. 2006); *see Narumanchi v. American Home Assur. Co.*, 317 F. App'x. 56 (2d Cir. 2009) (summary order) ("[B]oth the claim of entitlement to no-fault insurance benefits [ ] and

27

the claim of personal injury [ ] required [plaintiffs] to prove that the [ ] accident was causally related to plaintiff's stroke.")  However, "[w]hen moving for summary judgment on the ground that the collision did not cause a serious injury, a defendant must submit adequate medical evidence supporting that contention."  *Cross v. Lambombard*, 9 N.Y.S.3d 416, 415 (App. Div. 2015).  In *Pommells v. Perez*, 4 N.Y.3d 566, 830 N.E.2d 278 (N.Y. 2005), the New York Court of Appeals addressed the parties' respective burdens on summary judgment with regard to the issue of whether a pre-existing condition, rather than the accident at issue, caused the plaintiff's alleged injuries.  *Id.* at 572 (holding that "when additional contributory factors interrupt the chain of causation between the accident and claimed injury—such as a gap in treatment, an intervening medical problem or a preexisting condition—summary dismissal of the complaint may be appropriate.").  The Court of Appeals explained that, as the moving party, the defendant has the initial burden to submit "persuasive evidence" that the plaintiff's alleged pain and injuries were related to a pre-existing condition.[27]  *Id.* at 580.  In meeting this initial burden, the defendant

---

[27] In *Celotex Corp. v. Catrette*, 477 U.S. 317 at 322–23, the Supreme Court held that a court may grant summary judgment where the movant demonstrates an absence of sufficient evidence in the record to give rise to a genuine issue of material fact regarding an element essential to plaintiff's claim for which the non-movant bears the burden of proof at trial.  Thus, applying a *Celotex* framework, summary judgment could be granted in Defendants' favor on the issue of causation, solely on the basis that Plaintiffs' evidence is insufficient to raise a triable issue of fact as to whether Perpall's injuries were proximately caused by the 2010 accident, even if Defendants offer no evidence of their own.  *Celotex Corp.*, 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case.")  However, it appears that the Second Circuit follows New York State court's burden-shifting framework, which requires a defendant in a No-Fault Insurance Law case to first establish a *prima facie* case that the alleged injuries were not caused by the accident, but by an alternative cause.  *See Yong Qin Luo v. Mikel*, 625 F.3d 772, 777 (2d Cir. 2010) (per curiam) (applying New York's burden-shifting scheme with respect to each parties' burden of proving that a plaintiff's injury was "serious" under New York Insurance Law); *see also Rogers v. McLamb*, No. 4–CV–7043, 2006 WL 2734228, at *3 n.2 (S.D.N.Y. Sept. 22, 2006) (adopting New York's burden-shifting scheme, while acknowledging the tension with the holding in *Celotex Corp. v. Catrette*, 477 U.S.

must provide more than a conclusory statement by a medical professional that a pre-existing medical condition exists. *Pommells*, 4 N.Y.3d at 577–80 (comparing case where defendant's reliance on a "conclusory notation" in the medical records was insufficient to establish that plaintiff's pain could be chronic and unrelated to the accident to case where another defendant sufficiently raised an issue of causation by producing persuasive evidence of pre-existing degenerative disc condition and doctor's conclusion that plaintiff's injury was not caused by the subject accident based on doctor's examination of plaintiff and review of his medical records). If the defendant meets its burden, the burden shifts to the plaintiff to "come forward with evidence addressing the defendant's claimed lack of causation." *See Arenes v. Mercedes Benz Credit Corp.*, No. 03–CV–5810, 2006 WL 1517756, at *8 (E.D.N.Y. June 1, 2006) (citing *Pommells,* 4 N.Y.3d at 580). A plaintiff cannot defeat summary judgment if her submission consists of expert opinion that fails to adequately address plaintiff's pre-existing conditions. *See Pommells*, 4 N.Y.3d at 574–75 (finding dismissal of plaintiff's complaint proper when plaintiff's expert opined that his symptoms were "causally related to the history as stated," which included both the accident and plaintiff's kidney surgery, but "left wholly unanswered the question whether the claimed symptoms diagnosed" were caused by the accident). If the plaintiff fails to provide such evidence, the defendant is entitled to summary judgment. *See Arenes*, 2006 WL 1517756, at *8*; Pommells,* 4 N.Y.3d at 580.

Ultimately, if both parties have met their respective burdens, the Court may only grant summary judgment for the defendant if the record allows the Court to find, as a matter of law, that the pre-existing condition was the sole cause of the plaintiff's injury. *See Perl v. Meher*, 18 N.Y.3d 208, 219, 960 N.E.2d 424 (N.Y. 2011). The New York Court of Appeals decision in

317). The Court follows Second Circuit precedent and applies New York's burden-shifting analysis.

*Perl* is instructive on the application of the burden-shifting scheme specifically in the context of causation and a pre-existing condition. In *Perl*, the defendants presented a sworn radiologist's report based on an MRI that plaintiff's injuries were "degenerative in etiology and longstanding in nature, preexisting the accident." *Id.* The trial court found that this evidence shifted the burden to the plaintiffs to provide sufficient evidence to raise an issue of fact. *Id.* at 216, 218–19. In response, the plaintiff submitted another radiologist's affidavit, which acknowledged that some findings from the MRI were consistent with degenerative disease, but also opined that a single MRI could not rule out the possibility that the plaintiff's injuries had been caused by a specific trauma. *Id.* at 219. The plaintiff's treating physician also opined that the plaintiff did not have any pre-existing conditions. *Id.* The trial court found the plaintiff's evidence sufficient to raise an issue of fact. *Id.* The Court of Appeals agreed, explaining that although a factfinder could reject the treating physician's opinion, it could not say as a matter of law based on the record that a degenerative condition was the sole cause of plaintiff's injuries. *Id.* The Court of Appeals reversed the appellate court, and reinstated the trial court's denial of summary judgment to the defendants. *Id.* at 221.

### B.  Plaintiffs Have Failed to Address Defendants' Evidence

#### 1.  Lack of Causation as to Perpall's Shoulder Injuries

Perpall claims that the 2010 accident injured her left shoulder, which then required her to undergo arthroscopic surgery on that shoulder on January 3, 2013. (Dkt. 73-3, Def. Ex. E, Pl. Resp. to Interrog. at ECF 59.) She also alleges that her right shoulder was injured from overuse due to her left shoulder surgery. (Dkt. 75-14, Pl. Ex. L at ECF 68.) Defendants assert that, because of Perpall's pre-existing shoulder injuries, Perpall cannot prove that the 2010 accident was a proximate cause of her current shoulder injuries. (Dkt. 73-10, Def. Mem. at ECF 18–21.)

Here, Defendants have made a *prima facie* showing that Perpall's shoulder injuries are related to her pre-existing condition rather than the 2010 accident. Defendants proffer the following material to show that Perpall's shoulder conditions were pre-existing in nature and not caused by the accident: (1) the opinion of Dr. Passick; (2) Dr. Friedman's and Dr. Schweitzer's notes regarding their treatment and assessment of Perpall's left shoulder injury prior to the 2010 accident; (3) Dr. Naik's May 14, 2007 notes; and (4) Dr. Dayan's deposition testimony. In response, Plaintiffs rely on (1) two independent medical examination reports from 2005 by doctors who appear to have examined Perpall on behalf of State Farm Insurance Company related to the lawsuit stemming from Perpall's 2005 accident; (2) negative findings, in an August 17, 2005 MRI report, of impingement or rotator cuff tear to Plaintiff's left shoulder; (3) Dr. Naik's May 14, 2007 notes; and (4) Dr. Friedman's post-2010 narrative reports. As explained below, most of the evidence on which Plaintiffs rely is unconvincing. The key reason Plaintiffs fail to meet their burden is because Dr. Friedman's narrative reports do not adequately address Defendants' argument that Perpall's pre-existing shoulder conditions precipitated the need for surgery.

2. Defendants' Evidence

a. Dr. Passick's Post-2010 Examination of Perpall

Dr. Passick conducted multiple independent orthopedic examinations of Perpall (*see* Def. Ex. G), and Defendants rely on Dr. Passick's reports dated August 21, 2013 and December 16, 2014 in asserting that Perpall's pre-2010 shoulder conditions are intervening factors. [28]

---

[28] While Defendants discuss Dr. Passick's August 21, 2013 report and state that it is annexed as Exhibit G, an examination of that Exhibit indicates that Dr. Passick's August 21, 2013 report was not, in fact, submitted into the record. The Court, therefore, does not rely on this report.

According to Dr. Passick's December 16, 2014 report, after examining Perpall in person and reviewing her previous medical records dating back to 2005, Dr. Passick noted Perpall's prior history of "significant left shoulder pathology" and concluded that the surgery to her left shoulder was performed for a nontraumatic shoulder derangement, a condition Perpall was diagnosed with in 2006 by Dr. Schweitzer. (Dkt. 73-9, Ex. P at ECF 46; Dkt. 73-6, Ex. G at ECF 4–5.) In a subsequent report dated March 30, 2015, after examining Perpall's October 25, 2014 right shoulder MRI report and NCV/EMG studies report from Dr. Friedman dated October 8, 2013, Dr. Passick also opined that Perpall had a pre-existing condition as to her right shoulder and that the MRI report is inconsistent with Perpall's contention that the injury is due to overuse following the 2013 surgery to her left shoulder. (Dkt. 73-6, Def. Ex. G at ECF 2–3, 12–13) ("[Perpall] is right-hand dominant so the right extremity would normally be used more. Overuse, if present, might cause inflammation, but no anatomic findings demonstrable on MRI.").

   b.  Drs. Friedman's and Schweitzer's Pre-2010 Diagnoses of Perpall's Left
       Shoulder Injury

Defendants also rely on Perpall's history of medical treatment for her left shoulder by both Drs. Friedman and Schweitzer prior to the 2010 accident. In a report dated January 22, 2007, Dr. Friedman diagnosed Perpall with, among other things, post-traumatic left shoulder syndrome with impingement. (Dkt. 73-9, Def. Ex. O at ECF 27.) He noted that Perpall had "markedly diminished range of motion of the left shoulder to forced abduction, circumduction as well as flexion and extension." (*Id.*) Dr. Schweitzer's February 9, 2006 notes indicate that, around January 26, 2006, Perpall had undergone manipulation of the left shoulder under an intraarticular block (Dkt. 73-9, Def. Ex. P at ECF 45), and that by April 3, 2006, Perpall was diagnosed with left shoulder derangement—even though she had reported an increase in range of motion and less pain in her left shoulder following the manipulation (*id.* at ECF 46). Perpall

admitted to getting therapy for her left shoulder after the 2005 accident and basing one of the claims in the related lawsuit on that injury. (Dkt. 73-4, Def. Ex. F, Perpall Dep. 30:8–18.)

### c. Dr. Naik's Notes

Moreover, Defendants note that when Dr. Naik examined Perpall on May 14, 2007, she experienced a moderate degree of discomfort and rotational difficulties in her right shoulder. (Dkt. 73-9, Def. Ex. Q at ECF 84.) However, Dr. Naik also observed that Perpall's "left shoulder appear[ed] to be normal." (*Id.*) Defendants also emphasize that even Dr. Naik's May 23, 2007 notes indicate that Perpall had a history of impingement and bursitis of the right shoulder. (Def. Ex. Q at ECF 86.)

*        *        *

In sum, even giving no weight to Dr. Naik's May 23, 2017 notes,[29] the significance of which is disputed by the parties, the Court finds that Dr. Passick's reports, along with Drs. Friedman's and Schweitzer's pre-2010 diagnoses of Perpall's left shoulder injuries, are sufficient to satisfy Defendants' initial burden of showing a lack of causation. *See Evans v. United States*, 978 F. Supp. 2d 148, 167 (E.D.N.Y. 2013) (finding that plaintiff's pre-existing injuries in the same body part several years before the accident persuasive enough to shift the burden to plaintiff); *Arenes*, 2006 WL 1517756, at *8 (finding defendant's expert's report sufficient to shift

---

[29] Plaintiffs call into question the accuracy of Dr. Naik's reference to "impingement and bursitis of the right shoulder" because (1) Dr. Schweitzer's notes do not mention the right shoulder, (2) Dr. Naik's earlier notes do not mention the right shoulder at all, and (3) Dr. Naik's billing summaries do not mention treatment to the right shoulder. (Pl. Opp. at ECF 15–16.) However, Plaintiffs themselves seek to rely on Dr. Naik's notes from May 14, 2007, to the extent they create a triable issue of fact as to whether Perpall's post-2010 left shoulder injuries were caused or exacerbated by the 2010 accident. *See infra* at Section IV.B.3(c). Neither party can selectively object to or rely on Dr. Naik's notes; the Court therefore considers them in their entirety.

the burden where it stated that plaintiff's injuries were not consistent with an acute, traumatic event but, rather consistent with pre-existing and degenerative conditions).

*   *   *

### d. Dr. Dayan's Testimony

In addition to their arguments about Perpall's pre-existing shoulder injuries, Defendants argue that Plaintiffs' own expert, Dr. Dayan, has yet to opine that the 2010 accident caused Perpall's shoulder injuries. (*See* Dkt. 73-10, Def. Mem at ECF 20.) The Court agrees.

At his deposition, Dr. Dayan testified that he never offered an opinion as an expert that Perpall's left shoulder injury was caused by the 2010 accident. (Dkt. 73-7, Ex. I (Dayan Dep.) at 53:12–25.) He further testified that, in order to render an opinion about the source of Perpall's left shoulder problem, it would be important for him to first look at the information concerning Perpall's 2005 accident, which resulted in injury to her left shoulder—including any diagnostic films that show the condition of her left shoulder prior to his treatment of Perpall. (*Id.* at 54:13–55:5.)

In response, Plaintiffs argue that Dr. Dayan simply meant that he had not given expert opinion because he had not yet testified in court or at a deposition as an expert witness or issued a sworn narrative medical report as an expert. (Pl. 56.1 ¶ 20.) Plaintiffs further argue that Dr. Dayan's acknowledgement about not having provided an expert opinion "does not mean that [he] didn't give his preliminary opinion informally (to the patient and/or her attorney); or, that as a treating physician (vs. an "expert" witness), didn't make medical chart entries expressing his opinions and conclusions. This is what doctors do all the time." [30] (Pl. 56.1 ¶ 20.) Regardless of

---

[30] Plaintiffs argue that Dr. Dayan and Perpall had informal conversations, not reflected in her medical chart, but that there was a mutual understanding that "*when* and *if* her case comes up for trial, that the doctor and the attorney would then go over her case in detail. That is, the

whether Dr. Dayan formally stated an expert opinion, the Court finds that any opinion he has given is insufficient to create a triable issue of fact with respect to causation.

A review of the record indicates that Dr. Dayan stated in his notes documenting Perpall's January 30, 2015 visit that the 2010 accident caused injury to Perpall's shoulders: "[Perpall's] right shoulder symptomatology is the direct result of overuse and overcompensation, of the use of the right arm from her left shoulder injury, which was injured in a car accident in 2010." (Dkt. 73-8, Ex. M at ECF 68.)  It is noteworthy that throughout Dr. Dayan's nineteen visitation notes and his operative report (Plaintiffs' Exhibit D, Plaintiffs' Exhibit L, and Defendants' Exhibit M),[31] this is the *only* time that Dr. Dayan affirmatively attributed Perpall's shoulder conditions to the 2010 accident.

This single statement linking Perpall's injury to the 2010 accident, even construed as an expert opinion, is insufficient to raise a material issue of fact, because as Dr. Dayan indicated at his deposition, he was not fully aware of Perpall's 2005 car accident or of her shoulder impairments prior to her treatment by him (Dkt. 73-1, Ex. I at 19:2–20:7; Def. 56.1 ¶ 18).  Dr. Dayan testified that his overall understanding was that "according to what [Perpall] had told him, she had a direct injury to the left shoulder initially [as a result of the 2010 accident] and it was after she had that injury, during that period of time of pain, surgery and recuperation to the left

---

review of . . . any potentially relevant prior medical data or information regarding prior conditions, accidents, incidents . . . ."  (Dkt. 75-2, Pl. Opp. at ECF 12.)  For Dr. Dayan's opinion to raise a material issue of fact in the face of Defendants' showing of preexisting conditions related to Perpall's 2005 accident, Plaintiffs should have done this at the summary judgment stage.

[31] Plaintiffs' Exhibit D consists of six follow-up visit notes by Dr. Dayan, dated 8/28/2013, 10/14/2013, 11/8/2013, 2/7/2014, 5/9/2014, 6/20/2014. Plaintiff's Exhibit L consists of Dr. Dayan's operative report dated 1/3/2013 and nine office visit notes by Dr. Dayan. Defendants' Exhibit M consists of a Health Assessment Questionnaire that Perpall filled out on 9/14/2012 for Dr. Dayan, Dr. Dayan's initial evaluation note dated 9/14/2012, and three follow-up visit notes by Dr. Dayan dated 10/5/2012, 11/7/2012, 1/7/2013.

shoulder that she developed a secondary injury to her right shoulder." (Dkt. 73-7, Ex. I (Dayan Dep.) at 51:6–14.) But Dr. Dayan's deposition testimony makes clear that this opinion did not take into account Perpall's 2005 accident or prior shoulder injuries. He testified that "when [he has] information provided . . . by a patient that they had an accident in 2010 and there's no other information that would bring on the onset of a particular condition, that [he] would potentially" attribute the condition to the 2010 accident. (Def. 56.1 ¶ 17.) He testified that, had Plaintiff disclosed to him that she had a prior left shoulder injury in 2005, he would have noted that information in his report. (*Id.*; Dkt. 73-1, Ex. I (Dayan Dep.) at 19:2–20:7.) Dr. Dayan admitted that nothing in his records pertaining to his treatment of Perpall notes her 2005 accident. (Def. 56.1 ¶ 16.) He also testified that Perpall never told him that she had been diagnosed with right shoulder tendinopathy and impingement prior to the 2010 accident, that she had received treatment for her right shoulder, and that had she told him this, he would have noted them in his report because it was "pertinent" information that creates an entire picture of an injured body part. (Def. 56.1 ¶ 18; Dkt. 73-7, Ex. I (Dayan Dep.) at 37:4–15, 38:3–20.) Without knowing her history of prior impairments and treatment, Dr. Dayan believed that Perpall had "[r]ight shoulder rotator cuff tendinopathy with impingement" from overuse stemming from the 2013 surgery to her left shoulder. (Def. 56.1 ¶ 18.)

In response to being asked, "if [Perpall] had a right shoulder injury from a 2005 accident and treatment and care for two years following that accident, would that impact or affect your sense of how the right shoulder problem came about[]", Dr. Dayan testified, "[i]t would certainly add onto the conditions necessary to cause her present problem," although he could not say if the 2005 accident would have been a complete or partial cause for Perpall's right shoulder condition. (Dkt. 73-7, Ex. I (Dayan Dep.) at 51:24–52:11.) Dr. Dayan further testified that, although he

does not need to see every bit of documentation for a patient's earlier injury, he "certainly" would consider the "care and injury" following the 2005 accident to be important in order to properly assess the cause of the current injury. (*Id*. at 52:12–53:11.)[32]

While Dr. Dayan provided an opinion, albeit barely, in his notes, it does not raise a triable issue of fact as to whether Perpall's post-2010 injuries were proximately caused by the 2010 accident because his opinion did not take into consideration Perpall's 2005 accident and her prior diagnoses of internal derangement of her left shoulder, and impingement and bursitis as to both shoulders.[33] A reasonable factfinder could not find that the 2010 accident caused Perpall's current injuries based on Dr. Dayan's "opinion," given that Dr. Dayan was unaware of Perpall's

---

[32] Dr. Dayan testified as follows:

Q. Would it be fair that, in order for you to make that opinion or draw a conclusion it would be necessary for you to review all of the records and diagnostic care and treatment stemming from the prior event in order to figure out what happened following the event that you're treating [Perpall] with?"

A. Yes.

Q. Is it fair to say that if you didn't have [that] information you really couldn't offer an opinion about what brought about that problem?

* * *

A. The general answer is yes. I just want to elaborate on one word you said, "all." I'm not sure as an orthopedic surgeon I need to see every bit of documentation that went along with that original injury, but certainly the overall care and injury that occurred during that period of time would be important for me to—in order to make that kind of assessment which you just asked me.

(Dkt. 73-7, Ex. I at 52:12–53:11.)

[33] Dr. Dayan testified, "if there was another event that happened before [the 2010 accident] that involved the shoulders, that other event" could possibly be a reason for the problem with her shoulders, "but also maybe not necessarily." (Dkt. 73-7, Ex. I (Dayan Dep.) at 24:25–25:22.) He also testified that if the history that Perpall gave him about problems with her right shoulder was different, his position concerning the cause of Perpall's right shoulder injury might "possibly" be different. (*Id.* at 51:15–23.)

pre-existing conditions. *See Maye v. Stearns*, 19 A.D.3d 902, 903, 798 N.Y.S.2d 152 (App. Div. 2005) (holding that plaintiff's chiropractor's conclusion that plaintiff's conditions were causally related to the accident was based on an inadequate foundation where the chiropractor's affidavit and records indicated that he was unaware of plaintiff's prior injuries and accidents and failed to address plaintiff's pre-existing medical conditions); *see also Montgomery v. Pena*, 798 N.Y.S.2d 17, 18 (App. Div. 2005) (granting the defendant's summary judgment motion because the plaintiff's doctor did "not even mention the prior injuries or the preexisting conditions. . . In view of this omission, [plaintiff's doctor's] conclusion that plaintiff's condition is causally related to the subject accident is mere speculation insufficient to defeat defendants' well-supported summary judgment motion"); *Coston v. McGray*, 853 N.Y.S.2d 206, 208 (App. Div. 2008) (affirming summary judgment for defendants where plaintiffs' evidence made no reference to prior incidents and injuries).

### 3. Plaintiffs' Evidence

In their effort to rebut Defendants' assertion that there is no triable issue as to whether the 2010 accident caused Perpall's shoulder injuries, Plaintiffs rely on the two 2005 Independent Medical Examination ("IME") reports, Dr. Schweitzer's August 29 and September 22, 2005 notes, Dr. Naik's May 14, 2007 notes, and Dr. Friedman's post-2010 reports.

#### a. 2005 IME Reports

Plaintiffs do not specifically deny the existence of a pre-existing injury,[34] but their 56.1 Counter-Statement notes that Dr. Alan J. Zimmerman, an orthopedist, and Dr. Wendy Cohen, a neurologist, both concluded in 2005 that Perpall's left shoulder injury from the 2005 accident had "resolved." (Pl. 56.1 at ECF 13 ¶¶ 10, 11.) A review of the IME reports by Dr. Zimmerman

---

[34] Plaintiffs do call into question, however, whether there was a pre-existing right shoulder injury at all. (*See* Pl. 56.1 ¶ 18.)

and Dr. Cohen, both dated September 21, 2005, indicates that each doctor conducted an IME on behalf of State Farm Insurance Company in connection with Perpall's 2005 accident. (Dkt. 75-5, Pl. Ex. C at ECF 2, 6.) Dr. Zimmerman stated, "[l]eft shoulder sprain, resolved," and that no further treatment was needed from an orthopedic viewpoint. (Dkt. 75-5, Pl. Ex. C at ECF 4, 5.) However, contrary to what Plaintiffs state in their 56.1 Counter-Statement, Dr. Cohen's IME report does not state that Perpall's left shoulder injury was "resolved"; rather, it only stated that Perpall's cervical, thoracic, and lumbar strains/sprains were resolved. (Dkt. 75-5, Pl. Ex. C at ECF 6–10.) Moreover, Drs. Cohen's and Zimmerman's reports state that Perpall refused to "attempt [to] lift on the left above 90 degrees" (*Id.* at ECF 4), and that she complained of pain in her left shoulder to both doctors (*see* "Current Complaint" and "Present Complaints" in Dkt. 75-5, Ex. C at ECF 2, 6).

The rest of the record indicates that Perpall continued treatment of her left shoulder with Dr. Friedman, her treating physician, in spite of the September 21, 2005 IME reports by Drs. Zimmerman and Cohen. (Dkt. 73-9, Exs. O and P.) Dr. Friedman stated, in a note dated January 22, 2007, that "Perpall's prognosis for any further functional improvement is extremely poor in view of the chronicity of her symptoms" and that Perpall reported "violent neck spasm and limitation of range of motion," "occipital headaches," and "persistent left shoulder pain." (Dkt. 73-9, Def. Ex. O at ECF 24–28.) In short, Plaintiffs cannot rebut Defendants' demonstration of causation based on Perpall's pre-existing left shoulder by submitting two 2005 IME reports authored by doctors who were likely hired by Perpall's adversary in the 2005 accident case— especially when the record indicates that Perpall and her treating physician, Dr. Friedman, did not consider Perpall's left shoulder injury "resolved" in 2005 or 2007, and that Dr. Friedman

continued to provide extensive treatment to Perpall for more than a year after the reports by Drs. Zimmerman and Cohen.[35]

b. Dr. Schweitzer's 2005 Negative Findings

As previously noted—several years before the 2010 accident—Dr. Schweitzer diagnosed Perpall with internal derangement in her left shoulder in 2006 (Dkt. 73-9, Def. Ex. P at ECF 45), and Dr. Friedman diagnosed Perpall with left shoulder syndrome with impingement and shoulder derangement conditions in 2007 (Dkt. 73-9, Def. Ex. O at ECF 27; Dkt. 73-9, Ex. P at ECF 47). Yet, attempting to rebut Defendants' showing of Perpall's pre-existing shoulder conditions, Plaintiffs point to Dr. Schweitzer's 2005 negative finding of impingement or rotator cuff tears in the left shoulder (Dkt. 75-12, Ex. J) and Perpall's 2005 MRI and X-ray results of negative finding for any rotator cuff tears in the left shoulder. (Dkt. 75-8, Ex. F.)[36] However, these negative findings from 2005 do not diminish the fact that Perpall was diagnosed with shoulder injuries in *2006* and *2007*. While Dr. Schweitzer's notes dated July 7, 2006 indicate that Perpall reported improvement in the level of pain in her left shoulder (Dkt. 73-9, Def. Ex. P at ECF 52), this alone is insufficient to raise a triable issue of fact because it merely suggests some possible

_____

[35] Furthermore, although, as previously noted, medical records may be admitted as business records, pursuant to the FRE 803(6), whether the 2005 IME reports could be admitted as such is doubtful. *See Hamad v. Cook*, No. 13 Civ. 3222, 2014 WL 3507340, at *4 (S.D.N.Y. Jun. 30, 2014) ("[T]he proffered [business] record must be supported by a proper foundation, . . . [and it] is also necessary to show that the document in question was not drafted in response to unusual or isolated events." (citing *Phoenix Associates III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995) (internal quotation marks omitted)). The 2005 IME reports clearly were drafted in response to litigation, which raises questions about their reliability and the appropriateness of admitting them under the business records exception to the hearsay rule. Moreover, Plaintiffs have not even attempted to qualify the authors of the 2005 IME reports as expert witnesses, and there is no indication in the record whether they could be so qualified at trial.

[36] Though Plaintiffs assert that "[t]hese findings (*i.e.*, some arthritis) are grossly consistent with her age and a non-traumatic etiology," they do not cite anything in the record to support this assertion. (Dkt. 75-2 at ECF 14.)

improvement, but not complete resolution, of the injury, and it is only based on Plaintiff's self-report rather than some objective test. *See Evans*, 978 F. Supp. 2d at. 163 (requiring plaintiff to offer objective proof of an injury to defeat summary judgment once the burden shifted to the plaintiff).

### c. Dr. Naik's Reports

As previously noted, Dr. Naik's May 14, 2007 notes state that Perpall's "left shoulder appear[ed] to be normal." (Dkt. 73-9, Def. Ex. Q at ECF 84.) Plaintiff emphasizes this point in an effort to raise a disputed issue of fact. The issue is whether this is enough "evidence addressing the defendant[s'] claimed lack of causation." *See Arenes*, 2006 WL 1517756, at *8. The Court finds this to be insufficient because Dr. Naik's notes are not based on an evaluation of Plaintiff's left shoulder condition *after* the 2010 accident, but are merely based on a single observation three years prior to the accident. *See, e.g., Tsveitel v. Geoghegan*, No. 05–CV–5721, 2009 WL 2182379, at *9 (E.D.N.Y. Jul. 21, 2009) (finding plaintiff's expert report sufficient to raise an issue of material fact as to causation noting that the doctor examined the plaintiff *three days after the accident* at issue and addressed some of plaintiff's prior injuries); *Rivera v. U.S.*, No. 10 Civ. 5767, 2012 WL 3132667 (S.D.N.Y. Jul. 31, 2012) (finding plaintiff had presented sufficient admissible evidence to raise a triable issue of material fact as to causation where plaintiff's treating physician discussed plaintiff's physical health for both before and after the accident). Nor is Dr. Naik's observation that Perpall's left shoulder appeared to be normal supported by objective medical testing. *See Evans*, 978 F. Supp. 2d at 163.

### d. Dr. Friedman's Report

Plaintiffs argue that Dr. Friedman's narrative reports, which repeatedly stated that Perpall's current injuries were caused by the 2010 accident, are sufficient to rebut Defendants'

showing of the lack of causation. (Dkt. 75-2, Pl. Opp. at ECF 16.) However, after a close examination of Dr. Friedman's narrative reports dated December 20, 2010,[37] June 1, 2012, [38] May 31, 2013,[39] and February 6, 2015,[40] the Court concludes otherwise. These reports consist of unexplained conclusory statements that Perpall "basically" recovered from her 2005 accident and that the 2010 accident caused Perpall's current conditions. These unsupported statements are insufficient to create a material issue of fact. *See Franchini v. Palmieri*, 763 N.Y.S.2d 381, 383 (App. Div. 2003) (affirming summary judgment for the defendant and finding plaintiff's evidence insufficient because "[e]ven if [the chiropractor] were aware of [plaintiff's pre-existing conditions], he failed to explain his opinion that the pre-existing conditions had resolved before he began treating plaintiff or to cite any objective evidence to support that opinion."); *Marcellus v. Forvarp*, 956 N.Y.S.2d 13 (App. Div. 2012) (finding that plaintiff failed to raise a triable issue of fact, despite plaintiff having submitted medical evidence regarding her recent physical limitations and MRI findings, because plaintiff's experts did not address a previous medical report relating to a prior accident noting plaintiff's worsening pain); *see also Bravo v. Martinez*, 963 N.Y.S.2d 82 (App. Div. 2013) (affirming summary judgment for defendants where plaintiff had pre-existing injuries resulting from multiple prior car accidents and plaintiff's expert's report failed to adequately differentiate between injury after the previous accident and after the subject accident); *compare Sciarrone v. Juliano*, No. 13–CV–5985, 2014 WL 6783712, at *4 (E.D.N.Y. Dec. 2, 2014) (finding plaintiff's submission insufficient to create a material issue of fact

---

[37] (Dkt. 75-15 at Ex. M at ECF 11–12.)

[38] (Dkt. 75-15, Ex. M at ECF 8.)

[39] (Dkt. 75-16, Ex. N at ECF 5–6.)

[40] (Dkt. 75-7, Ex. E at ECF 6.)

regarding plaintiff's head injury because plaintiff's experts failed to adequately address whether the white matter lesion in an MRI existed prior to the accident at issue) *with Hahnel v. U.S.*, 782 F. Supp. 2d 20, 26 (W.D.N.Y. 2011) (finding plaintiff's submission sufficient when her doctor's affidavit acknowledged plaintiff's pre-accident complaints and pre-existing back aches but also stated that her sciatica is more likely "new" because it was not recorded in any of her pre-accident medical notes by three other doctors).

The record provides an ample basis for viewing Dr. Friedman's post-2010 conclusory statements with skepticism. Despite painting a dismal picture of Perpall's injuries and prognosis in 2007 and attributing these injuries to the 2005 accident, in his most recent narrative report, dated February 6, 2015, Dr. Friedman concluded that Pepall had "fully" and "completely" recovered from her 1991 lumbar surgery and 2005 accident—without any further elaboration or even mentioning his own notes pertaining to Perpall's visits soon after the 2005 accident. (*Compare* Dkt. 73-9 at ECF 27–28 *with* Dkt. 75–7, Pl. Ex. E at ECF 2–6.) Then, after the 2010 accident—using language nearly identical to the language he used to discuss Perpall's injuries following the 2005 accident—Dr. Friedman stated that Perpall's injuries are "permanent in nature and causally related" to the 2010 accident. (*Compare* Dkt. 73-9 at ECF 28 *with* Dkt. 75–7, Ex. E at ECF 6.)

What is critically missing from Dr. Friedman's 2015 report is any elaboration on Perpall's supposed recovery from the conditions and impairments she suffered as a result of the 2005 accident that Dr. Friedman himself determined in 2007 to be "permanent in nature". (Dkt. 73-9, Def. Ex. O at ECF 15.) Dr. Friedman did not examine Plaintiff between January 2007 and the 2010 accident, and he cites no medical evidence or documentation in support of his conclusion that Plaintiff had "completely recovered" from her pre-2010 injuries. (Dkt. 75–7, Pl.

Ex. E at ECF 6.) *Compare Hernandez v. Almanzar*, 821 N.Y.S.2d 30, 31 (App. Div. 2006) ("Although [plaintiff's doctor] acknowledge[d] that plaintiff had been injured in the October 1999 and January 2003 accidents, he did not explain the basis for his claim that the deficits he allegedly found in [ ] 2005 . . . were proximately caused by that accident, rather than by the October 1999 accident, and were only exacerbated (not caused in the first instance) by the January 2003 accident.") *with Farook v. Bailey*, No. 05–CV–3785, 2007 WL 2076764, at *3 (S.D.N.Y. Jul. 16, 2007) (finding sufficient evidence put forth by plaintiff, noting that plaintiff's doctor's medical opinion "as to causation specifically discusses the pre-accident evidence proferred by Defendants").

At best, Dr. Friedman's conclusions that Perpall had "fully recovered" from her pre-existing injuries and that the 2010 accident therefore caused her current conditions were based on his observation that Perpall had been working regularly for years prior to the 2010 accident (Dkt. 75-15 at ECF 12; Dkt. 75-15, Ex. M at ECF 8). In another report, Dr. Friedman stated that Perpall had "basically recovered and had been functioning at work quite well prior to December 9, 2010." (Dkt. 75-16, Ex. N at ECF 5–6.) Such opinions, however, are not sufficient evidence to raise a genuine issue of material fact—especially when Dr. Friedman himself noted that Perpall had been "totally disabled from July 12, 2005 through December 31, 2005." *See Dabier v. Yager*, 297 A.D.2d 831, 832, 748 N.Y.S.2d 38 (App. Div. 2002) ("Plaintiff's treating physician opined that the accident exacerbated plaintiff's pre-existing degenerative condition, resulting in permanent pain which was unlikely to improve. However, the opinion is not based on an observed condition that the expert causally related to the accident. Instead, the expert based his opinion on the conclusion that, despite plaintiff's pre-existing cervical and lumbar

condition, 'he was actually doing reasonably well' prior to the accident." (citing *Toure v. Avis Rent A Car Sys.*, 98 N.Y.2d 345, 351 (N.Y. 2002)).

In addition, Dr. Friedman's reports fail to rebut Defendants' showing of lack of causation because his reports do not sufficiently address the opinions of Defendants' experts. In his May 31, 2013 narrative report, Dr. Friedman "vigorously disagrees" with the reports by Defendants' experts, Drs. Passick and Anant. (Dkt. 75-16, Ex. N.) But he does not explain why. He simply makes the statement that the 2010 accident exacerbated her pre-existing condition, again without explaining what exactly that exacerbation is or on what basis he concluded that such exacerbation had occurred. The report states:

> I have reviewed an independent neurosurgical consultation by Dr. Ashok Anant based on his examination of April 5, 2013. I respectfully, but vigorously disagree with his statement, "it is my opinion within reasonable degree of medical certainty that lumbar spinal stenosis at L3-4 is not causally related to the automobile accident dated December 9, 2010. Any proposed surgery to the site which, as per Dr. Kuflik requires extension of spinal fusion and decompression, is not related to the automobile accident dated December 9, 2010." With a reasonable degree of neurological certainty, had Ms. Perpall had not been reinjured on December 9, 2010, she would not have had as rapidly progressive cervical and lumbar deficits. She would not be a candidate for lumbar surgery at this time.

> I have also reviewed an independent orthopedic assessment by Dr. Jeffrey Passick based on his examination of April 10, 2013. I respectfully, but vigorously disagree with his statement, "today's exam is consistent with her pre-existing history and there are no residuals related to the accident of December 9, 2010."

> (Dkt. 75-16, Ex. N.)

"Absent an explanation of the basis for concluding that the injury was caused by the accident, as opposed to other possibilities evidenced in the record, an expert's conclusion that plaintiff's condition is causally related to the subject accident is mere speculation, insufficient to support a finding that such a causal link exists." *Valentin v. Pomilla*, 873 N.Y.S.2d 537, 539

(App. Div. 2009) (citation and internal quotation marks omitted); *see also Rhone v. United States*, No. 04 Civ. 5037, 2007 WL 3340836, at *9 (S.D.N.Y. Nov. 9, 2007) (granting summary judgment for defendant where plaintiff's physician stated that plaintiff's injuries were causally related to the accident at issue but did not explain what led him to that finding and failed to consider the evidence of degeneration); *Evans*, 978 F. Supp. 2d at 172–73 ("[T]o the extent that the Plaintiff is claiming that the January 6, 2010 accident aggravated asymptomatic pre-existing conditions, the Plaintiff is required to provide objective evidence that distinguishes aggravation of a pre-existing condition from the pre-existing condition itself."). Because Dr. Friedman's reports fail to indicate the objective basis for his conclusion that Perpall's current physical limitations and pain are attributable to the 2010 accident rather than to her pre-existing conditions, there is no triable issue of fact as to whether the 2010 accident caused Perpall's shoulder injuries. *See Arenes*, 2006 WL 1517756 at *9 (applying *Pommells v. Perez*, 4 N.Y.3d 566 (2005), and finding that plaintiffs failed to submit evidence sufficient to demonstrate a triable issue of fact when a medical report by plaintiffs' doctor failed to explicitly address defendants' experts' finding that injuries were caused by a pre-existing, degenerative condition).

Citing *Perl*, Plaintiffs assert that the disagreement among experts as to causation is a credibility issue for the jury. (Dkt. 75-2 at ECF 24 (citing *Perl Meher*, 18 N.Y.3d 208, 960 N.E.2d 424 (N.Y. 2011)).) But in *Perl*, as previously discussed, the Court of Appeals found that the plaintiff had provided sufficient evidence to rebut the defendants' claim that causation between the accident and the plaintiff's injury was lacking. 18 N.Y.3d at 218. Here, Plaintiffs have not submitted sufficient evidence in response to Defendants' expert submissions to raise a genuine issue of material fact.

In sum, Defendants have met their initial burden of providing persuasive evidence that Perpall's current shoulder injuries were caused by her previous shoulder conditions, and Plaintiffs have failed to rebut this evidence. Thus, the Court grants summary judgment to Defendants as to Perpall's claim that Defendants are liable for alleged injuries to both of her shoulders.[41]

### C.    Neck and Back Injuries

Defendants contend that, given Perpall's pre-existing injuries, Perpall's neck and back injuries were not caused by the 2010 accident and that Plaintiffs have failed to rebut the evidence of a pre-existing condition. (Dkt. 73-10, Def. Mem. at ECF 11.) Defendants also argue that those injuries are not "serious injuries" as defined by New York Insurance Law § 5102(d). (Dkt. 73-10 at ECF 21; Dkt. 74, Def. Reply at ECF 11–15.) The Court first addresses the issue of causation.

In asserting that Perpall had pre-existing conditions related to headaches and neck and back pain, Defendants mainly rely on Perpall's records of her lower back surgeries in 1991 and 1992 (Dkt. 73-9, Def. Ex. N), records of Perpall's treatment with Dr. Friedman (Dkt. 73-9, Def. Ex. O) and Dr. Schweitzer (Dkt. 73-9, Def. Ex. P), and Dr. Passick's reports (Dkt. 73-9, Def. Ex. G).[42] (*See* Def. Mem. at ECF 21–23.) The Court finds that Defendants have made a *prima facie*

---

[41] The Court also grants summary judgment to Defendants for Perpall's claim regarding her right shoulder because that claim was wholly based on the claim involving Perpall's left shoulder injury.

[42] Although Defendants discuss at length Dr. Passick's findings of "adjacent segment degeneration related to the prior surgery," and "degenerative lumbar disease and no clear cut traumatic injuries," along with Dr. Passick's comparison of Perpall's cervical MRI films, Defendants do not cite to the record in their Memorandum of Law. Moreover, an examination of Defendants' Ex. G does not include reports by Passick containing such passages. Thus, the Court has not factored in these findings by Dr. Passick on which Defendants rely**.**

showing that Perpall's pre-existing injury caused her current neck injuries but have not done so for her lower back condition.

### 1.     Defendants' Evidence

There is ample evidence in the record that Perpall had an extensive medical history of treatment for headaches and neck and back pain prior to the 2010 accident.  (*See* generally Background Section.)  For example, in 2005, Perpall underwent a left cervical plexus block (*see* Dkt. 73-9, Def. Ex. P at ECF 40) and a trigger point injection to the left paracervical region (*see id.* at ECF 42.)  She also underwent a sphenopalatine ganglion block for her headaches in 2005 and 2006.  (Dkt. *id.* at ECF 41, 57.)

However, it is not enough for Defendants to simply show that Perpall has been treated for headaches and neck and back pain in the past.   Defendants must also show—and not just assert in a conclusory manner—that Perpall's current condition was caused by those pre-existing injuries rather than by the 2010 accident.  *See e.g. Nasrallah*, 1998 WL at *8 ("[T]he fact that [plaintiff] already had degenerative disc disease does not prevent an accident from causing serious injury by aggravating this condition."); *see also Perl*, 18 N.Y.3d at 218 (reversing lower court's dismissal of the complaint on appeal because the Court of Appeals could not conclude as a matter of law that degenerative conditions that preexisted the accident were the sole cause of plaintiff's injuries).  For a pre-existing condition to "interrupt the chain of causation between the accident and claimed injury," the current injury must be attributable to the pre-existing condition. *See e.g.  Evans*, 978 F. Supp. 2d at 167   (finding defendant's evidence persuasive when he showed that plaintiff had pre-existing conditions similar to the injuries plaintiff claimed were caused by defendant as a result of the accident); *Kim v. Rodriguez*, No. 14–CV–3799, 2016 WL 6581230, at * (E.D.N.Y. Nov. 4, 2016) (finding persuasive evidence of lack of causation when a doctor observed that, before the car accident, plaintiff complained of tenderness along the joint

line in his right knee and that the location of the tenderness was the same as the location where he had surgery following the collision at issue); *see also Arenes*, 2006 WL 1517756, at *8 (finding defendant's evidence persuasive when defendant's expert's report stated that plaintiff's injuries are not consistent with an acute, traumatic event such as a car accident, but rather consistent with wear-and-tear of the normal aging process).

a. Defendants' Evidence of Perpall's Pre-existing Lower Back Injury

Although Defendants show that Perpall had two lower back surgeries in 1991 and 1992 involving her L4-5 lumbar spine, the mere fact that Perpall received lower back surgeries twenty-four years before the accident at issue is not persuasive evidence that Perpall's current lower back injuries were not caused or exacerbated by the 2010 accident. *See Evans*, 978 F. Supp. 2d at 167 (finding evidence concerning the plaintiff's injury forty years prior to the accident at issue not to be sufficiently persuasive).

To the extent that Defendants assert that Perpall's previous spinal fusion surgeries caused her current lower back condition, the Court finds that Defendants have not met their initial burden, for the reasons below. Reports by Drs. Passick and Anant opine that people who undergo spinal fusion surgery end up experiencing adjacent level disc problems and degenerative changes. Specifically, after examining Perpall's medical history and records,[43] Dr. Anant[44] opined in his report that

---

[43] *E.g.*, records from Dr. Friedman (6/14/1991) indicating examination for intermittent back problems since 1987 and his diagnostic impression of low back syndrome with herniated disc at L4-L5; Perpall's lumbar spine MRI dated 7/6/1991, 10/3/1991; CT of Perpall's lumbar spine dated 4/23/1991; records from Dr. Paul Kuflik in 1991 and 1992 indicating the claimant underwent two surgeries prior to the 2010 accident. (Dkt. 73-6 Ex. H.)

[44] Although the specific report by Dr. Passick to which Defendants refer to in their motion is not in the record, Dr. Anant's report contains somewhat similar findings.

Dr. Kuflik's reports indicate that the claimant has developed lumbar spinal stenosis at L3-L4 one level above the previous fusion at L4-L5. *In my opinion, this represents adjacent level degenerative disc disease and stenosis* which is confirmed on MRIs and CT studies and is comprised of ligamentous hypertrophy and ventral disc bulge.

Adjacent level disease commonly occurs after spinal fusions and is seen either one level above or one level below the site of previous fusion surgery. *It is my opinion within reasonable medical certainty that lumbar spinal stenosis at L3-L4 is not causally related to the automobile accident dated 12/9/10.* Any proposed surgery to the site which as per Dr. Kuflik requires extension of spinal fusion and decompression, is not related to the automobile accident dated 12/9/10.

(Dkt. 73-6, Ex. H at ECF 26 (emphasis added).)

In short, as to the issue of causation, Dr. Anant's report makes a narrow finding that Perpall's "lumbar spinal stenosis at L3-L4" is not causally related to the 2010 accident. (*Id.*)

Dr. Passick makes a conclusory statement that "[a]djacent level disc problems and degenerative changes are common findings after lumbar fusion. MRI findings reflect this. Today's lumbar exam is consistent with her preexisting history and there are no residuals related to the accident of 12/9/10." (Dkt. 73-6, Def. Ex. G at ECF 20.)

Setting aside the insufficiency of Dr. Passick's conclusory opinion that Perpall's injury was caused by her fusion surgery, both Dr. Anant's and Dr. Passick's opinions are insufficient to shift the burden to Plaintiffs because Perpall's alleged injuries are not limited to the "lumbar spinal stenosis at L3-L4" or to lumbar discs adjacent to where her spine was fused (L4-L5). For example, Perpall also alleges that the accident caused post-traumatic bulging lumbar discs at L1-L2 and L2-L3 (*i.e.*, non-adjacent levels to L4-L5) as well as lumbar radiculopathy.[45] (*See* Dkt. 75-2, Pl. Opp. at ECF 21–22.) Though Defendants have shown that Perpall suffered from pre-

_____

[45] Even assuming that it is true that Perpall's spine was also fused at L5-S1, as Defendants assert (Dkt. 74, Def. Mem. at ECF 13), it still does not explain away Perpall's disc bulges at the L1-L2 and L2-L3 level as they are not adjacent to the L5-S1 segment of the spine.

existing injuries in the general lumbar spine region, they have failed to demonstrate that her pre-existing injuries were not exacerbated by the accident. *See Nasrallah*, 1998 WL at *8 (noting the possibility of an accident aggravating pre-existing degenerative disc diseases); *see also Endres v. Shelba D. Johnson Trucking, Inc.*, 60 A.D.3d 1481, 1482–83 (App. Div. 2009) (noting that report of physician who examined plaintiff at defendants' request failed to offer any basis upon which to conclude that plaintiff's injury was caused by a pre-existing condition and was not exacerbated by the accident); *McKenzie v. Redle*, 47 A.D.3d 775, 776 (App. Div. 2008). Thus, the Court finds that Defendants fail to provide sufficient evidence of an alternative cause for *all* of Perpall's alleged lower back injuries, and do not explain whether the symptoms relating to her back that she experienced prior to the 2010 accident are similar to her current symptoms. *See Croisdale v. Weed*, 32 N.Y.S.2d 399, 400 (App. Div. 2016) ("although defendants contended in support of the motion that plaintiff's left knee injuries were preexisting and the result of a degenerative condition, they failed to submit evidence establishing as a matter of law that the injuries were entirely preexisting and were not exacerbated by the accident in question" (internal citation and punctuation omitted)).

b. Defendants' Evidence of Perpall's Pre-existing Neck Injury

Perpall claims that the 2010 accident caused injury to her neck in that she suffers from disc herniations at the C5-6 level, straightening of the normal cervical lordosis, cervical radiculopathy, and neck pain. (Pl. Opp. at ECF 21.) The Court finds that Defendants have met their initial burden of establishing that Perpall's neck injury was pre-existing.

As an initial matter, although Defendants frame their argument as an issue of pre-existing injury, the Court notes that most of Dr. Anant's report actually supports Defendants' other proposition—that Perpall does not have the type of injury she claims—rather than demonstrating

that Perpall's current neck condition stems from her pre-existing injury.  Dr. Anant stated, after reviewing Perpall's April 30, 2012 cervical spine MRI report, that although there were "small central disc bulges at C5-C6", there was "no mention of vertebral fractures, subluxations, hematomas, or ligamentous injury."  (Dkt. 73-6, Def. Ex. H at ECF 26.)  After reviewing Dr. Hecht's EMG testing reports of the upper extremities dated April 29, 2011, which were read as normal, Dr. Anant concluded that there was no evidence of cervical radiculopathy, as Perpall claims.  (Dkt. 73-6, Def. Ex. H at ECF 25–26.)  Although he found that Perpall had decreases in the ranges of motion in her cervical spine, he attributed it to "symptom magnification."  (*Id.* at ECF 26.)[46]

Similarly, Dr. Passick's July 10, 2013 report stated, "There is subjectively decreased range of motion of the cervical spine not correlated with objective findings.  [Perpall] had normal muscle testing, sensation and reflexes of the upper extremities.  There is no objective evidence of orthopedic residuals to the cervical spine related to the accident of 12/9/10."  (Dkt. 73-6, Ex. G at ECF 20.)  Dr. Passick's December 9, 2010 report—which more directly addresses the issue of

---

[46] "'Symptom magnification' is defined as '[c]onscious or unconscious exaggeration of symptom severity in an attempt to convince an observer that one is truly experiencing some level of pain." *Demaree v. Life Ins. Co. of N. Am.*, 789 F. Supp. 2d 1002, 1010 n.5 (S.D. Ind. 2011).  Courts are divided on whether a physician's assessment that a plaintiff's limited range of motion was due to symptom magnification is enough for a defendant to meet his initial burden of proving the lack of serious injury on the part of the plaintiff.  *Compare Walsh v. Double N. Equiptment Rental Corp.*, 35 Misc. 3d 1218(A), 2012 WL 1521864, at * 4 (Sup. Ct. Apr. 20, 2012) (denying defendants' summary judgment motion where a doctor who examined plaintiff on behalf of defendants stated that limitation of range of motion was due to some degree of symptom magnification without further explanation) and *McKenzie v. Redl*, 47 A.D.3d 775, 776 (App. Div. 2008) ("[A]lthough [defendants' expert found decreases in plaintiff's ranges of motion, he] established no basis upon which it might be concluded that such decreases were neither caused nor exacerbated by the [] accident.") *with Style v. Joseph*, 820 N.Y.S.2d 26, 28 n.1 (App. Div. 2006) (finding that defendant met his burden despite doctor's finding that plaintiff had restricted range of motion where the doctor explained that restriction was self-imposed).  Here, the Court does not rely solely on Dr. Anant's diagnosis of "symptom magnification" with regard to Perpall's neck injuries, but has also considered Dr. Passick's diagnosis, which is consistent with that of Dr. Anant.

pre-existing neck injuries—notes that the MRI report of Perpall's cervical spine, dated July 14, 2005, indicated disc bulges at C3-4, C4-5, C5-6, C7-T1, and T1-2.[47] Finally, in his July 29, 2015 report, he concludes that there were "pre-existing degenerative changes to the cervical . . . spine" and that Perpall simply has "cervical spine strain." (Dkt. 73-6, Def. Ex. G at ECF 12.)

Moreover, evidence supports Defendants' contention that Perpall's symptoms of persistent spasm in the neck and limited ranges of motion pre-existed the 2010 accident. While Dr. Friedman noted in his February 6, 2015 report that Perpall had "[p]ersistent spasm. . . in the paracervical . . . regions . . . [and that c]ervical rotation was guarded to 45 degrees out of 90 right and left" (Dkt. 75-7, Pl. Ex. E at ECF 3), he also observed—on January 16, 2006—Perpall to have "daily chronic neck pain and occipital headaches" along with "cervical rotation [that] was guarded to 30 degrees out of 90 right and left." (Dkt. 73-9, Ex. O at ECF 26.) Even a year later, on January 22, 2007, Dr. Friedman observed that Perpall "remained with marked spasm[,] multiple myofascial trigger points in the paracervical regions . . . [, and daily occipital headaches.]" (*Id.*)

Based on this evidence, the Court finds that Defendants have demonstrated that Perpall's current complaints are extremely similar to conditions she was diagnosed with several years before the 2010 accident, and that Defendants have met their burden of establishing a pre-existing neck injury. Thus, the burden shifts to Plaintiffs to show that the accident, in fact, caused Perpall's neck injury or exacerbated a pre-existing neck injury. *See Linton v. Nawaz*, 879 N.Y.S.2d 82, (App. Div. 2009) (finding a physician's affirmation sufficient to shift to plaintiff burden of demonstrating that a triable issue existed as to whether his injuries were caused by the

---

[47] The report states, "MRI report of the cervical spine from Stand-Up MRI of Bensonhurst dated 7/14/05. Impression: C3/4, C5/6 and T1/2 posterior disc bulges with ventral CSF impression. C4/5 and C7/T1 posterior lesser subligamentous disc bulges." (Dkt. 73-6 at Ex. G at ECF 15.)

accident where the physician asserted that abnormalities appearing on the MRIs of the cervical spine were degenerative in nature and pre-existed the accident).

        2.      Plaintiffs' Evidence

Plaintiffs' memorandum of law does not explicitly address Defendants' argument that Perpall's neck injuries pre-existed the 2010 accident. An independent review of the evidence reveals that Plaintiffs have failed to raise a genuine dispute of material fact for the same deficiencies discussed earlier in dismissing Plaintiffs' claims based on Perpall's shoulder injuries. *See supra* Section IV.B.3. Because Dr. Friedman's reports fail to explain—in a non-conclusory manner—how and why Perpall's pre-existing neck conditions are different from her neck injury allegedly caused by the 2010 accident, the Court grants summary judgment to Defendants as to Perpall's claims relating to her neck.

**D.     Serious Injuries**

Defendants also assert that Plaintiffs are not entitled to non-economic damages because Perpall cannot prove that she was "seriously injured." An injury is considered "serious" if it falls under one of the nine categories listed in Section 5102(d) of the New York Insurance Law: injury that "results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of body function or system or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment." N.Y. Ins. Law § 5102(d).

Just as a defendant bears the initial burden to establish lack of causation, *Pommells*, 4 N.Y.3d at 580, a defendant also bears the initial burden of establishing a *prima facie* case that plaintiff did not sustain a "serious injury," as a matter of law, within the meaning of N.Y. Insurance Law § 5102(d). *Yong Qin Luo v. Mikel*, 625 F.3d 772, 777 (2d Cir. 2010); *see also Baez v. Rahamatali*, 850 N.E.2d 19, 6 N.Y.3d 868, 869 (N.Y. 2006) (memorandum) (citing *Gaddy v. Eyler*, 79 N.Y.2d 955, 956–57 (1992)). If the defendant meets this initial burden, then the plaintiff must present medical evidence based on objective proof of injury to establish the existence of a serious injury and "subjective complaints of pain will not, standing alone, support a claim for serious injury." *Yong Qin Luo*, 625 F.3d at 777.

Of the nine categories of "serious injury," Plaintiffs allege that the 2010 accident caused injuries pertaining to the following five categories: (1) significant disfigurement, (2) fracture, (3) a significant limitation of use of a body function or system, (4) a permanent consequential limitation of use of a body organ or member, and (5) a medically determined injury of a non-permanent nature that prevented her from performing substantially all of the material acts constituting her usual and customary daily activities, *i.e.*, the "90/180 category." (Am. Compl. ¶ 30.)[48] Of these five categories of injuries, Defendants challenge only three: (1) significant disfigurement; (2) fracture; and (3) the "90/180 category".[49] Although the Court finds no genuine issue of material fact as to whether the 2010 accident caused "serious injury" as to the categories of "90/180" and "significant disfigurement," the Court finds that Defendants have not

---

[48] Although Perpall also alleged that she suffered "personal injuries [ ] resulting in a loss of use of a body organ, member function or system," such injuries are not considered "serious injuries" under Section 5102(d) unless they are "permanent." Perpall did not allege that her injuries resulted in *permanent* loss of use of a body organ, member function, or system. (*See* Am. Compl. ¶ 30.)

[49] Defendants also assert that Plaintiff did not suffer death, dismemberment, or loss of a fetus, but Plaintiff never alleged that the 2010 accident caused such injuries. (*See* Am. Compl.)

met their initial burden of establishing that the accident did not cause Perpall "serious injury" as to the categories of "significant limitation," and "permanent consequential limitation."

1.    Fracture

Although Plaintiff alleged in her Amended Complaint that she suffered a serious injury of fracture, she does not deny Defendants' contention that there is no evidence that Plaintiff suffered a fracture as a result of the 2010 accident.  (*See* Am. Compl. ¶ 30; Pl. Opp.)  Moreover, there is no record evidence to support such a claim.  Therefore, there is no genuine issue of material fact as to whether Plaintiff suffered "serious injury" in the form of a fracture.

2.    90/180 Claim

Perpall also asserts that she suffered serious injuries that belong to the last category of New York Insurance Law § 5102(d), alleging that she suffered injuries that "prevent[ed her] . . . from performing substantially all of the material acts which constitute[d her] usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment."  N.Y. Ins. Law § 5102(d); Compl. ¶ 30.  This claim "relates to temporarily disabling conditions."  *Perl*, 936 N.Y.S.2d at 661.  "When a plaintiff claims that he has suffered a serious injury because he has sustained [serious injury under the 90/180 category], he has to demonstrate, besides the medically determined injury, that he was indeed prevented from performing activities for at least 90 days and that the curtailment was to [a] great degree rather than slight."  *Johnson v. Singh*, 32 Misc. 3d 1219(A), 12, 934 N.Y.S.2d 34 (Table) (N.Y. Sup. Ct. 2009) (quoting *Licari v. Elliott*, 441 N.E.2d 1088 (N.Y. 1982); *see Walsh v. Henry*, 21 Misc. 3d 1131(A), 9, 873 N.Y.S.2d 516 (Table) (N.Y. Sup. Ct. May 3, 2005) (citing *Gaddy v. Eyler*, 591 N.E.2d 1176 (1992)).

"[I]t is [ ] well settled that a defendant can establish prima facie entitlement to summary judgment with regard to 90/180 category . . . by citing to evidence, such as plaintiff's own

testimony demonstrating that he was not prevented from performing all of the substantial activities constituting plaintiff's customary daily activities for the prescribed period." *Johnson*, 32 Misc.3d at 16 (citation omitted). "Once defendant meets his burden, plaintiff must come forward with competent medical evidence demonstrating his inability to perform substantially all of his daily activities for not less than 90 of the first 180 days as a result of the accident alleged." *Id.* (citing *Ponce v. Magliulo*, 781 N.Y.S.2d 703 (App. Div. 2004)).

Defendants contend that Perpall's 90/180 claim should be dismissed because (a) Perpall returned to work within the first ninety days after the accident, and (b) she only missed approximately two months of work.[50] (Dkt. 73-10 at ECF 23; Dkt. 73-4, Def. Ex. F, Perpall Dep. I 14:21–15:3.) Plaintiffs do not respond to these arguments.[51] Nonetheless, after independently reviewing the evidence, the Court finds that Defendants have met their initial burden of establishing that Perpall has not suffered serious injury under the 90/180 category, and that Plaintiffs have failed to raise a genuine dispute of material fact as to the applicability of the 90/180 category of serious injury.

---

[50] Perpall's return to work within the first ninety days after the accident, in itself, is not a basis for granting summary judgment to Defendants as to Perpall's 90/180 claim. Under New York Insurance Law, Perpall need not show that she was prevented from "performing substantially all" customary material activities for the *first* ninety days immediately after the accident, but that she was prevented from performing these activities for ninety days *during* the first one hundred and eighty days after the accident. N.Y. Ins. Law § 5102(d) (requiring that a person is prevented from performing substantially all customary activities "during" the statutory period).

[51] This alone is reason to grant summary judgment to Defendants as to Perpall's 90/180 claim. *See Armella v. Olson*, 22 N.Y.S.3d 722, 722-723 (App. Div. 2015) ("Plaintiff opposed the [summary judgment] motion only with respect to the permanent consequential limitation of use and significant limitation of use categories of serious injury alleged in the complaint . . . and has therefore abandoned his claims with respect to the other categories of serious injury."); *see also Gatti v. Schwab*, 33 N.Y.S.3d 618, 619 (App. Div. 2016).

"The fact that a plaintiff returns to work during the relevant [180-day] period does not necessarily defeat a claim of serious injury [under the 90/180 category]". *Sanchez v. Travelers Cos., Inc.*, 658 F. Supp. 2d 499, 509 (W.D.N.Y. 2009) (citing *Vasquez v. Weiss*, 234 A.D.2d 658, 659, 650 N.Y.S.2d 60 (App. Div. 1996)); *Vasquez*, 234 A.D.2d at 659 (finding that plaintiff's returning to work one month after accident was not necessarily fatal to her claim of serious injury recognizing that plaintiff "returned to work out of economic necessity"); *Judd v. Walton*, 703 N.Y.S.2d 845, 846 (App. Div. 1999) (mere fact that plaintiff returned to work within the statutory period did not preclude finding of serious injury, especially where plaintiff "rel[ied] on assistants to carry all but the lightest objects for him" and his "injuries prevented [him] from performing his usual household duties, participating in recreational activities or engaging in sexual relations"); *Nigro v. Penree*, 661 N.Y.S.2d 137, 138 (App. Div. 1997) (although plaintiff returned to work, the court denied defendant's summary judgment on 90/180 claim because plaintiff was "unable to perform the activities of his profession" as a tennis instructor). However, courts have generally found a defendant's initial burden met where the plaintiff worked for more than ninety of the one hundred and eighty days following an accident or returned to work soon after the accident. *See Licari v. Elliott*, 441 N.E.2d 1088, 1092 (N.Y. 1983) (finding no 90/180 claim where plaintiff returned to regular work duties 24 days after the accident); *Fludd v. Pena*, 997 N.Y.S.2d 14, 16 (App. Div. 2014) (finding no 90/180 claim where police officer returned to limited duty eight weeks after her accident); *Travis v. Batchi*, 75 A.D.3d 411, 412, 905 N.Y.S.2d 66 (App. Div. 2010) (granting summary judgment to defendants where plaintiff conceded that she worked from home beginning two months after the accident, and failed to detail the particular job and other activities that were curtailed), *aff'd Perl v. Meher*, 960 N.E.2d 424 (N.Y. 2011); *Linton*, 879 N.Y.S.2d at 90 (granting summary judgment to

defendants on plaintiff's 90/180 claim where period between the accident and plaintiff's return to work part-time was only 79 days); *Barth v. Harris*, 2001 WL 736802, at *10 (finding that because plaintiff was able to work for more than 90 out of 180 days following the accident, whether he suffered a "medically determined injury or impairment" was irrelevant); *Burns v. McCabe*, 794 N.Y.S.2d 267, 268 (App. Div. 2005) (finding that defendants sufficiently established that plaintiff did not experience serious injury under the 90/180 category where she returned to school a week after the accident and missed only five weeks of work at her part-time job even though she could not participate in gym class and dancing); *Rivera v. U.S.*, 2012 WL 3132667, at *12 (finding defendant established *prima facie* case of showing that plaintiff did not suffer serious injury under 90/180 category by producing tax documents indicating that plaintiff earned the same level of income as she had prior to the accident).

Here, Perpall testified that she only missed about two months of work after the 2010 accident. (Dkt. 73-4, Ex. F at 14:21–15:6.) The Court finds that this evidence alone satisfies Defendants' burden of establishing a *prima facie* case that Perpall's injury did not satisfy the requirements of the 90/180 category. *See Schader v. Woyciesjes*, 865 N.Y.S.2d 177, 178 (App. Div. 2008) (finding that the defendant met his initial burden with respect to the 90/180 claim by submitting, *inter alia*, plaintiff's deposition testimony). Thus, the burden shifts to Plaintiffs to show that Perpall's injury meets the requirements of the 90/180 category.

However, unlike the plaintiffs in *Vasquez, Judd,* or *Nigro*, discussed *supra*, Perpall has not come forward with evidence demonstrating that there is a genuine dispute of material fact as to whether her injury is "serious" under the 90/180 category, *i.e.*, whether she was "curtailed from performing her usual activities to a great extent". *See Gaddy*, 79 N.Y.2d at 958. First, Perpall has "not specif[ied] her usual and customary daily activities before the accident, or which

of those activities she was unable to perform after the accident . . . ." *Keenva v. Trappen*, 742 N.Y.S.2d 344, 345 (App. Div. 2002) (citation and internal quotation marks omitted); *cf. Poux v. N.Y. City Transit Auth.*, 859 N.Y.S.2d 906 (Table), 2008 WL 746531 (Sup. Ct. Feb. 11, 2008) (finding plaintiff's doctor's conclusory affirmation and report noting that plaintiff was disabled and unable to work until a particular date was insufficient to make out a *prima facie* case that she suffered a "serious injury" in the 90/180 category); *Yagliyan v. Gun Shik Yang*, 241 A.D.2d 518 (App. Div. 1997) ("[P]laintiff's self-serving assertion that he could not perform his usual type of work after the accident did not establish a [90/180 claim].")

Second, her testimony indicates that when she returned to work after the accident, she was not limited in her work activities. For example, she admitted that she returned to her normal duties as an auditor at the department of social services, maintained her 50-50 division of time spent at her desk and in the field, and kept her normal hours (Def. Ex. F1, at 12:18–13:9 (position as an auditor); 16:1–11 (desk and fieldwork); 15:23–25 (normal hours).) Plaintiffs have made no showing that Perpall's activities were "restricted 'to a great extent rather than some slight curtailment'". *Berk v. Lopez*, 718 N.Y.S.2d 332, 333 (App. Div. 2000) (quoting *Szabo v. XYZ Two Way Radio Taxi Assn.*, 267 A.D.2d 134, 135, 719 N.Y.S.2d 332 (App. Div. 1999) ("There is no evidence that plaintiff's injuries prevented her from performing her professional duties; her need to relieve pain by lying on the floor of her office . . . or leaning against the wall during business meetings falls far short of satisfying the statutory threshold."); *Murphy v. Arrington*, 295 A.D.2d 865, 867, 744 N.Y.S.2d 255 (App. Div. 2002) (affirming granting of summary judgment to defendants and finding insufficient proof to demonstrate that plaintiff police officer, who was dragged by a car, sustained a serious injury under the 90/180

category, where he missed only six weeks of work after the accident and was put on light duty assignment for another six weeks).

A plaintiff can satisfy the 90/180 category of serious injury by presenting evidence that plaintiff's physician placed restrictions on her activities. *See Cummings v. Jiayan Gu*, 839 N.Y.S.2d 663, 665 (App. Div. 2007) (noting the absence of any evidence that plaintiff's physicians placed restrictions on his activities); *see, e.g., Judd*, 703 N.Y.S.2d at 846 (noting plaintiff's testimony, as confirmed by his doctor, that plaintiff "was instructed not to carry anything heavier than a dinner plate for much of the statutory period"). Here, however, Perpall has not presented evidence that any of her doctors placed restrictions on her activities during the first 180 days following the accident. (*See, e.g.,* Dkt. 73-4, Ex. F, Perpall Dep. I at 16:3–8.)

### 3.    Significant Disfigurement

"An injury is disfiguring if it alters for the worse a person's natural appearance." *Vega v. Gomez*, No. 11–CV–212, 2012 WL 4069301, at *6 (S.D.N.Y. Jul. 27, 2012) (citing *Caruso v. Hall*, 477 N.Y.S.2d 722, 724 (App. Div. 1984)). "A scar falls within [the category of significant disfigurement] if a reasonable person would deem it unattractive or objectionable or feel that it could subject the injured person to pity or scorn." *Cross v. Labombard*, 127 A.D.3d 1355, 1357 (App. Div. 2015); *see also Pecora v. Lawrence*, 840 N.Y.S.2d 851, 853 (App. Div. 2007) (discussing proper jury instructions for the significant disfigurement category of serious injury).

The parties disagree as to whether Perpall experienced significant disfigurement due to the 2010 accident. Perpall asserts that the 2010 accident caused her to undergo shoulder surgery, which resulted in "residual surgical scarring," and that there is a question of fact as to whether it qualifies as "significant disfigurement." Without citing to legal authority, Defendants respond that such scars do not qualify as "serious injuries" because they are secondary to the surgical

procedures performed by Dr. Dayan.[52]  However, because Plaintiffs have not met their burden of demonstrating that Perpall's shoulder surgery was causally related to the 2010 accident, they "necessarily also fail[] to meet their burden on the issue whether the resulting surgical scar was causally related to the accident."  *Kilmer v. Strek*, 827 N.Y.S.2d 808, 809 (App. Div. 2006); *see Johnson*, 32 Misc.3d at 16 ("It is axiomatic that a defendant who negates causation, establishes that an accident did not cause the injuries claimed, [and thus] establishes prima facie entitlement to summary judgment.")

4.      Other Categories of Serious Injury

As for the two other categories of "serious injury" claimed by Perpall, Defendants are not entitled to summary judgment, because they have failed to address them.  *See Gaddy*, 591 N.E.2d at 1177 (noting that defendants bear the initial burden of establishing that an injury is not "serious").  Accordingly, the Court finds that there remains a triable issue of fact as to whether Perpall sustained "serious injury" to her back on the basis that she suffered "permanent consequential limitation of use of a body organ or member" or "significant limitation of use of body function or system."

**CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED with respect to Plaintiffs' claims based on injuries to Perpall's shoulders and neck,

---

[52] In fact, courts have considered surgical scars on parts of the body to raise a question of fact as to whether it qualifies as a significant disfigurement.  *See, e.g., Cross v. Labombard*, 127 A.D.3d 1355, 1357 (App. Div. 2015) (shoulder); *Cook v. Peterson*, 28 N.Y.S.3d 501, 504, 507 (App. Div. 2016) (finding triable issue of fact regarding whether five surgical scars on the spine constituted disfigurement).  Moreover, the Court finds unconvincing Defendants' suggestion that the surgery is an intervening factor to Perpall's post-surgical scar, which thus does not qualify as "significant disfigurement."  *See id.* at 507 ("[T]o the extent that there is an issue of fact whether the occipital neuralgia was caused by the accident, there is likewise an issue of fact whether the scarring sustained by plaintiff as a result of the surgery necessitated by the occipital neuralgia was caused by the accident.")

and her claims of serious injury under the categories of fracture, 90/180 category, and significant disfigurement, but DENIED as to Plaintiffs' claims based on Perpall's back injuries. Furthermore, in order to recover non-economic damages, Perpall must show that any back injuries she suffered were "serious" and qualify as "permanent consequential limitation" or "significant limitations" as defined under New York Insurance Law.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: March 27, 2017
      Brooklyn, New York